EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
**POULTNEY'S HEIRS *vs.* CECIL'S EXECUTOR.** *vs.*
CECIL'S EX'R.

APPEAL FROM THE COURT OF THE FIRST JUDICIAL DISTRICT.

| 8L 321 |
| 52 1917 |

| 8L 321 |
| 106 300 |

According to the *Civil Code* of 1808, no one could be compelled to accept a succession and assume the quality of heir; and, having accepted, might renounce, and even accept again, in some instances. Until such acceptance and renunciation, the inheritance was a fictitious being, representing in every respect the deceased. Before acceptance, the title of the heir is not vested: So, where the widow renounced the community, and no person claimed as heir for thirteen years, the estate was considered and held to be vacant. *Civil Code of* 1808, *art.* 118, *p.* 172.

The rules and forms prescribed for the alienation of minors' property as such, viz : that it can only be sold in pursuance of the advice of a family ·meeting, and for its *appraised value*, do not apply to property alienated by judicial authority, at the instance of creditors, and for the payment of debts which formed a charge on the estate; because the sale of property in which minors were interested, for the payment of debts, has always formed an exception to the rule.

Minor heirs, without acceptance, must be considered as strangers to the succession, which is in itself vacant, and not represented by an heir; consequently, the heirs are not entitled to citations and notices in the proceedings by the creditors to sell and distribute the property, in payment of the debts.

After the time for deliberation has elapsed, an alienation made fairly, by competent judicial authority, and for the payment of debts due by the deceased, and more especially mortgaged debts on the property alienated, will conclude the heirs who accept afterwards, with the benefit of inventory.

It is a settled principle that the retroactive effect of an acceptance, which is in truth but a fiction, should not be so extended as to operate to the prejudice of the rights of third persons, previously acquired.

Where a respite has been granted to a debtor, by his creditors, and he dies before the first instalment becomes due according to the terms of the respite, his estate will be considered insolvent, and the debts all due and

41

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

demandable, notwithstanding the respite, if the estate is accepted with benefit of inventory.

According to the Spanish law, an estate not represented by an heir, might be provided with an administrator or curator, at the instance of creditors, with a view to administering it *in concurso*, for the benefit of all concerned.

It is only necessary to seek out and cite the heirs in a proceeding to administer an estate *in concurso*, to ascertain if they will accept or renounce the succession: and where the tutrix was present and renounced the community, and declined either accepting or renouncing for the minor heirs, whose rights were fully exercised by her, it was held, that no other citation or notice to them was necessary.

Under the *Civil Code* of 1808, the District Court had jurisdiction *ratione materiæ*, of proceedings against a vacant estate, administered for the benefit of creditors, and could legally appoint administrators, curators or syndics to administer and dispose of the property of such estate, for the benefit of all interested therein.

In a petitory action, persons (as heirs) claiming the estate, are bound to make good their title against the legal possessor; and in opposition, the latter has a right to set up and prove by every legal means, any title which may defeat the claim of the plaintiffs.

The first purchaser cannot repudiate the title by which he has sold to his vendee; and the averment in a petition, by him, that the proceedings were null under which the title was first acquired, cannot avail third persons who were not parties to them.

The sheriff's deed and return upon the execution and judgment, furnish *prima facie* evidence of a valid alienation; and he who attacks it, must show that the forms of law were *not* complied with.

Mortgagees are not prohibited from bidding for and purchasing the mortgaged premises, when sold under execution.

Syndics may consent to the terms of sale of mortgaged property, that it be sold on a credit, and without appraisement; and such consent is binding on the heirs who afterwards claim the property, unless they show they were injured by it.

Where sales of property under execution, are regular, the *rights of* purchasers will be maintained, although the judgment is afterwards reversed for want of jurisdiction in the court by which it was rendered.

This is an action of revendication. The two minor children and heirs at law of the late John Poultney, by their mother and natural tutrix, instituted this suit on the 3d of December, 1832, to recover a large lot of ground situated in the now city of Lafayette, and which made part of the property of their deceased father at his death, and now in the possession of the defendant, William Cecil. The ground in controversy forms part of a plantation purchased by John Poultney, by public act, dated the 27th of May, 1818, from Madame Rousseau. This title is not disputed.

The defendant pleaded the general issue; and that the plaintiffs never legally accepted their father's succession, and are not the owners of the property claimed by them. He avers he purchased it from Charles Harrod and Francis B. Ogden, by public act, dated the 30th June, 1824, who are bound to warrant his title and possession; he therefore calls them in warranty, and in case of eviction, prays judgment for damages over against them.

C. Harrod, in answer to the call in warranty, admits that he and his co-warrantor sold the property in question to the defendant, but denies the claim of the latter to damages, in case of eviction. He avers that by the original act by which Poultney acquired the property now claimed by his heirs, the firm of Harrod & Ogden, of which he is surviving partner, became endorsers of the notes given for the different instalments, amounting to eighty thousand dollars, and on condition that if they had to pay any of them, they should be subrogated to all the rights of the vendor; that Poultney failed to pay any of the instalments; that said firm paid the first instalment, and he has paid the remainder, and is now subrogated to all the rights of the vendor: he prays that if the proceeding be annulled under which he claims, that the sale be rescinded for the non-payment of the purchase money.

A curator ad hoc was appointed to represent Francis B. Ogden, called in as co-warrantor with C. Harrod, and who was shown to reside out of the state. His interest and defence is the same as that of his co-warrantor. Upon these pleadings the parties went to trial.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

The facts of the case, as shown by the evidence, are as follow : John Poultney purchased the plantation of Madame Rousseau, for one hundred thousand dollars, of which twenty thousand dollars were paid in cash, the balance in five equal instalments, payable in one, two, three, four and five years, for which notes were given to the order, and endorsed by Harrod & Ogden. On the 26th of April, 1819, Poultney finding himself in embarrassed circumstances, applied to the District Court for a stay of proceedings and call of his creditors, to deliberate on his affairs, with a view to granting him a respite. A meeting was accordingly ordered, by which a respite of one, two and three years was accorded for the payment of his debts contracted up to that time. Harrod & Ogen appeared at the meeting and voted for the respite for an ordinary debt of two thousand dollars, and on the first instalment of sixteen thousand dollars, for which they had endorsed the note and taken it up. The schedule of Poultney presents assets to the amount of two hundred and thirty-seven thousand nine hundred and twenty-one dollars, and debts owing, to the amount of two hundred and seven thousand two hundred and ninety-five dollars. In presenting this statement to his creditors, he says that there are abundant means to pay his debts with good management, and some indulgence.

On the 23d of October, 1819, Poultney died, leaving a widow and two minor children ; and on the 25th, two days after, the seals were affixed on his effects. On the 11th December, 1819, an inventory of the effects of the succession was made, at the instance and on the petition of the widow, assisted by A. L. Duncan and J. R. Grymes, Esqs., her counsellors and attorneys at law ; and on the 26th of January, 1820, the widow made a formal renunciation of the community, before a notary, by authentic act.

On the 11th February, 1820, Lloyd & Harrison and other creditors of Poultney, filed a petition in the District Court, alleging his death, their belief of the insolvency of his estate, that his widow had renounced the community, and that there was no person legally authorised to administer it ; they

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

prayed for a meeting of creditors to take into consideration the affairs of the succession, for the purpose of naming syndics to administer the same. A meeting was accordingly ordered, and held on the 13th of March, George Lloyd, Henry Foster and P. V. Ogden were appointed syndics. The proceedings of the creditors were brought into court on the 22d of March. On the 4th of April, on the petition of Lloyd, Foster and Ogden, they were authorised by an order of court to take possession of the property and sell it according to law. On the 24th of April the syndics presented another petition, stating that Poultney died possessed of certain real estate, among which *was that now in dispute,* including the plantation purchased from Madame Rousseau, and that it was subject to a mortgage for eighty thousand dollars, sixteen thousand dollars of which had been due since the month of May, 1819 ; they pray that they may be authorised to sell the same for the purpose of paying the mortgages on such terms and conditions as the court may direct. On filing this petition the court ordered that the creditors and all others interested, show cause on the 6th of May, why the real property belonging to the succession, should not be sold according to the petition.

No further action appears to have taken place on this rule. It does not appear that the widow or minor children of Poultney in any way interfered or were made parties to these proceedings. But two powers of attorney are in evidence ; one dated in 1821, and the other in 1823, in which the widow Poultney *in her own* behalf, and as tutrix of her minor children, joins with the syndics of Poultney's estate, and they appoint attorneys in fact, with full power " to *ask, demand* and *receive* in their name, all *inheritances, legacies, shares* or *claims* which may in any way devolve or come to either of them, or to the succession of the late John Poultney, &c."

On the 9th May, 1820, Charles Harrod, George M. Ogden and Peter V. Ogden, presented their petition to the District Court, stating the purchase of the plantation from Madame Rousseau by Poultney ; that the property had been specially

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

mortgaged to secure the payment of the notes which had been endorsed by them, and that by the act of sale, it was stipulated that, in case they, the endorsers should be obliged to pay said notes, they should be subrogated to the mortgage, and to all the rights of the seller. That the first of the notes had been protested and paid by them, and the second would become due in a few days, when they would be called upon to pay it. They pray for an order of seizure and sale of the property, for so much of cash as will pay the amount of the two first instalments of sixteen thousand dollars each, the necessary costs and expenses; and that the other payments may be made to coincide with the periods at which the other three notes shall respectively fall due. That George Lloyd, Peter V. Ogden and Henry Foster, be cited to answer the petition. The following order is given and signed by the judge: "It is ordered that the mortgaged property in the petition mentioned, or so much thereof as may be sufficient to satisfy the petitioners' demand, be seized and sold according to law. May 8, 1820." On the following day an order of seizure issued, directed to the sheriff, commanding him to sell the mortgaged property, or so much thereof as will pay and satisfy the plaintiffs' demand of thirty-two thousand dollars, interest and costs. On the 31st May, 1820, a document is filed, dated 29th May, 1820, signed by Harrod & Ogden, by G. M. Ogden and by the syndics, consenting that the property seized and advertised should be sold, subject to three notes secured by mortgage, and payable at the following dates, viz: one note payable 30th May, 1821, for sixteen thousand dollars; one note payable 30th May, 1822, for sixteen thousand dollars; one note payable 30th May, 1823, for sixteen thousand dollars; amounting together to forty-eight thousand dollars, the balance of the purchase money payable in cash, without appraisement. On the same day the judge orders a sale to be made in conformity with the agreement. On the order of seizure, the sheriff returns that he served writ, copy of petition and notice to pay in three days on Mr. Lloyd, one of the defendants. May 10, 1820. That on the 13th June, 1820, he sold the

property to George M. Ogden, payable pursuant to an order of court, for forty-eight thousand dollars, one-third on 30th May, 1821, one-third on 30th May, 1822, and one-third on 30th May, 1823, being the amount due to widow Rousseau, and twenty-one thousand dollars in cash.  This return is not made until 18th June, 1823.   The citation to Lloyd, Ogden and Foster, is to appear and answer in ten days after service, which is made on Lloyd only, on 9th May.   On the 10th March, 1823, judgment by default is entered on a motion of counsel for plaintiffs.    On the 29th March, 1823, judgment by default is confirmed on first note of sixteen thousand dollars.   The sheriff, in the deed of sale, conveys the interest of John Poultney, junior, without any reference to that of the heirs.

On the 16th January, 1824, Charles Harrod and the heirs and representatives of George M. Ogden, filed a petition in the Court of Probates, praying for an order of seizure and sale of the property purchased by Poultney from Madame Rousseau, to pay the amount of three of the notes given as part of the purchase money thereof, and which they, as endorsers, had been compelled to take up.   They state the death of Poultney, leaving his widow and two children, Matilda and Emily, both minors ; that the widow had renounced, that she was the natural tutrix of the minors. They pray that she be cited as tutrix of the minors, to answer, and in that capacity be decreed to pay the sum of forty-eight thousand dollars, and that in the meantime the mortgaged premises be seized and sold.   Francis B. Ogden, one of the plaintiffs, swears to the truth of the allegations of the petition, and that the *heirs* of John Poultney, named in the petition, are justly indebted in the sum of forty-eight thousand dollars.   One of the notes referred to in the petition is that for the first instalment, and the same on which the order of seizure and sale had issued in the District Court. On the 17th January, the following order is made and signed by the judge :  "Let the defendant be cited to answer the within petition, and in the meantime let the mortgaged premises be seized and sold by the sheriff according to law."

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

A citation issued in the ordinary form to Mrs. Poultney, to appear and answer to the petition in ten days after service. On the citation the sheriff makes the following return: "Served copy of petition and citation and also of the within order on the widow Poultney, by leaving the same with John R. Grymes, her attorney. January 26, 1824." On the 22d January, an order of seizure and sale issued, directed to the sheriff, commanding him to seize and sell the property described in the petition. The sheriff returns, that he had seized the property, and that on the 23d day of February, 1824, sold sundry lots for seven thousand nine hundred and sixty dollars to different individuals who had become the purchasers of them on the 25th and 26th of June, 1822; having exposed the remainder of the plantation according to law, Charles Harrod and F. B. Ogden became the purchasers thereof, for the price of twenty-seven thousand dollars. On the 27th February, 1824, a judgment by default is entered on motion of attorney of plaintiffs. The notes sued on were not filed with the petition, nor were they produced in court until 5th March, when a motion was made to compel the recorder of mortgages to produce two of them. On the 15th March, final judgment for forty-eight thousand dollars, with interest, was rendered against Mrs. Poultney, as tutrix of her minor children, Matilda and Emily.

On the 13th May, 1824, Francis B. Ogden and Charles Harrod presented a petition to the District Court, stating the proceedings in the suit of Harrod & Ogden vs. the syndics of Poultney, in that court, and the sale of the plantation, under order of seizure and sale, to George M. Ogden. They allege that said sale was a mere nullity, having been granted by a court having no jurisdiction, and that George M. Ogden acquired no title thereby, and that the mortgage granted by him was merely void. They state their purchase at sale under order of Court of Probates, and pray that G. W. Morgan, sheriff, be cited to show cause why he should not raise said mortgage. The sheriff, in his answer, admits the allegation in the petition; the judge ordered that the mortgage be raised, the sale having been made without any legal authority.

The foregoing statement embraces all the proceedings, as shown by the evidence, in relation to the administration and disposition of Poultney's succession.   The defendant, Wm. Cecil, purchased a large square in the Rousseau plantation, which had been laid off into lots, from Charles Harrod and Francis B. Ogden, by public act, passed before Carlile Pollock, notary public, dated the 30th of June, 1824.    This lot or square, forms the subject of contestation, in this suit. Cecil died before judgment, and the suit was continued against C. Harrod, his executor.

On the 26th November, 1832, previous to filing this suit, the widow Poultney applied, and was confirmed in the office of tutrix to her minor children, and took the oath.   On the 21st of January, after the institution of this suit, she presented a petition, stating, she believed it would be for the interest of the minors, to accept the succession of their deceased father, with the benefit of inventory, and prayed for a family meeting to deliberate thereon.   On the 15th of March, a family meeting was held, who declared that it would be for the benefit of the minors, to accept with the benefit of inventory, and the proceedings were homologated.   On the 3d of April, 1833, an inventory of Poultney's estate was taken, comprising the property now in dispute.

One of the minors having died since the institution of the suit, her succession was accepted by her surviving sister, and by her mother.   The sister consequently claims seven-eighths and the mother one-eighth of the property in contest.

The cause was submitted to a jury, on an elaborate charge to them, by the district judge presiding.   The jury returned a verdict for the defendant.   A motion was made to obtain a new trial, which was overruled, and judgment rendered in conformity to the verdict.   The plaintiffs appealed.

*Grymes* and *J. Slidell*, for the plaintiffs, made the following points:

1. The defendants claim under a title derived from the ancestor of the plaintiffs.   They consequently cannot contest its validity, nor set up an outstanding title with which they

42

EASTERN DIST.
*June,* 1835.

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

do not connect themselves. The burden of the proof is with them to show, that the title of the ancestor has been legally divested. *Verret's Heirs* vs. *Candolle* 4, *Martin, N. S.,* 402. *Trahan* vs. *M'Manus,* 2 *Louisiana Reports,* 209. *Bedford's Heirs* vs. *Urquhart, ante,* 241.

2. The acceptance of the inheritance by the heirs has a retroactive effect; they are considered as having taken possession of the estate at the time of their father's decease. *Old Civil Code, page* 160, *article* 72, 73. Their right to the property could only have been divested by lawful acts done with the administrator or curator of the vacant estate. *Old Civil Code, page* 164, *article* 95.

3. The District Court was without jurisdiction of any claims for debt against the estate of deceased persons. The Court of Probates had exclusive jurisdiction of such claims. *Vignaud* vs. *Tournacourt's Curator,* 12 *Martin,* 229. *Cox* vs. *Martin's Heirs,* 12 *Ibid.,* 361. *Old Civil Code, page* 178, *article* 137. *Waters* vs. *Wilson,* 3 *Martin, N. S.,* 137. *Debuys* vs. *Yerby,* 1 *Ibid., N. S.,* 380. *Baillio* vs. *Wilson,* 3 *Ibid., N. S.,* 72. *Wilson* vs. *Baillio,* 3 *Ibid., N. S.,* 74. *Lafon's Executors* vs. *Phillips,* 2 *Ibid., N. S.,* 230. *De Ende* vs. *Moore,* 2 *Ibid., N. S.,* 337. *M'Donough* vs. *Johnson's Executors,* 2 *Ibid., N. S.* 287. *Miles* vs. *Ford,* 2 *Ibid., N. S.,* 439. *Flood* vs. *Shaumburg,* 3 *Ibid., N. S.,* 625.

4. No forced surrender could be had of the estate of a deceased person on the suggestion of its insolvency. It could only be administered by the Court of Probates after the act of 1820. *Dupuy* vs. *Griffin,* 1 *Martin, N. S.,* 198. *Jenkins* vs. *Tyler,* 3 *Ibid., N. S.,* 182.

5. Even if the District Court could have exercised jurisdiction and a forced surrender could have been had at the instance of creditors, the proceedings are null and void as against the heirs of Poultney, because they were not cited nor in any manner made parties thereto. Where there is no citation, the nullity is absolute. *Weimprender's Syndics* vs. *Weimprender,* 11 *Martin,* 17. *Guirot* vs. *His Creditors,* 12 *Ibid.,* 654. *Bernard* vs. *Vignaud,* 1 *Ibid., N. S.,* 1. *Cochrane* vs. *Smith,* 2 *Ibid., N. S.,* 553. *M'Micken* vs. *Smith,* 5 *Ibid., N. S.,* 427. *Love* vs. *Dickson,* 7 *Ibid., N. S.,* 161.

*Marchand* vs. *Gracie*, 2 *Louisiana Reports*, 148. *Curia Philippica*, page 66. *Febrero*, vol. 6, 50, 57, article 145, page 483.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

6. No order of seizure and sale could issue until the act importing confession of judgment had been declared executory against the heirs. *Old Civil Code, page* 200, *article* 229. *Ibid.*, 490 *article* 7.

7. The order of seizure and sale issued irregularly, because the plaintiffs had no right to demand a sale for an amount greater than that of the note actually paid by them or of which they were in possession.

8. Peter V. Ogden was both plaintiff and defendant in the suit ; where a party sues himself there can be no *contestatio litis*.

9. The petition prayed for a citation to the syndics in the ordinary form, and asked judgment ; this was an abandonment of the *via executiva*, and the order of seizure was improperly issued. *Gurlie* vs. *Coquet*, 3 *Martin*, *N. S.*, 500. *Weimprender* vs *Fleming*, 8 *Ibid.*, *N. S.*, 96.

10. The property was not advertised according to law The order of the judge, fixing the terms of sale, bears date the 31st May, and the sale was made by the sheriff on the 13th June. Thirty days' advertisement is prescribed by law ; no appraisement was made ; the consent of the syndics cannot cure the defect of a formality prescribed by law for the benefit of all debtors, even of full age. *Old Civil Code, page* 490, *article* 3.

11. If the appointment of syndics was regular, the property should have been sold by them under the provisions of the insolvent laws. *Act of* 1817, *page* 140, *section* 30. *Ibid.*, *page* 142, *section* 37. An order of seizure and sale could not issue. *Chiapella* vs. *Lanuse's Syndics*, 10 *Martin*, 448.

12. By the terms of the respite granted by the creditors of Poultney and homologated by the court, and to which Harrod and Ogdens had given their express assent, no portion of the debt due on the purchase from Mad. Rousseau was exigible at the period when the order of seizure was obtained. Madame Rousseau although a mortgage creditor would have been bound by it. *Old Civil Code, page* 440, *article* 6.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

7 *Febrero, page* 116, *No.* 132.   Harrod and Ogdens were bound by their own act granting a respite on the very note on which their order of seizure and sale was obtained.

13. George M. Ogden as seizing creditor could not purchase the property sold for the payment of his debt. 6 *Febrero, page* 494, *Nos.* 344, 345.   *Curia Philippica, page* 161, *No.* 24.   *Ibid., page* 163 *No.* 23.

14. The bill of sale of the sheriff under the proceedings in the District Court only conveys the interest of J. Poultney, junior, not that of his heirs.   But even if a good title had been vested in G. M. Ogden, the defendant not claiming under him cannot avail himself of it.   *Bedford's heirs* vs. *Urquhart, ante,* 241.

15. G. M. Ogden never complied with the terms of adjudication.   His heirs and representatives joined in a suit in the Court of Probates, in which the property said to have been purchased by him was seized and sold four years after as the property of the heirs of Poultney.   Charles Harrod and Francis B. Ogden were both parties to this suit ; the defendants claiming under them are bound by their acts and declarations.

16. The defendants claiming under Harrod and Ogden are precluded by their proceedings in the District Court against G. W. Morgan, in which the sale is treated as a nullity, and a judgment rendered in conformity with their allegations.

17. The creditors of Poultney were not debarred from proceeding against his succession before the Court of Probates, by the inaction of the tutrix.   They could have called upon the minors to accept the succession or renounce, and in the event of renunciation have caused an administrator to be appointed by the proper tribunal.   *Curia Philippica page* 56, *No* 11, *article* 167; 6 *Febrero, page* 65.   Or if syndics were to have been appointed, it should have been by the Probate Court.

18. The proceedings in the Probate Court are null and void, because the act of mortgage had not been declared executory against the heirs, and because they were not cited;

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

see authorities quoted in fifth and sixth points, and further, for the reasons mentioned in the seventh and eighth points.

19. The return of the sheriff of service of citation on John R. Grymes, as attorney, is not even *primâ facie* evidence of his authority. *L'Eglise* vs. *His Creditors*, 4 *Martin*, *N. S.*, 238. *Skillman* vs. *Jones*, 3 *Ibid.*, *N. S.*, 686. *Smith* vs. *Winbush*, 3 *Louisiana Reports*, 442. *Holliday* vs. *M'Cullough*, 3 *Martin*, *N. S.*, 177. But if the return of the sheriff were *primâ facie* evidence of the authority, it may be disproved by the affidavit of the party. *Dangerfield's Executors* vs. *Thurston's*, 8 *Martin*, *N. S.*, 235.

20. If the return of the sheriff be good evidence of authority of attorney and the citation sufficient, still the sale is a nullity, because the service was made on the 26th January, and the sale took place on the 23d February, not leaving time for the thirty days' advertisement required by law.

21. A forced alienation, if all forms of law be not complied with, conveys no title to the purchaser. *Dufour* vs. *Camfranc*, 11 *Martin*, 607. *Johnston's Executors* vs. *Wall*, 1 *Ibid.*, *N. S.*, 545. *Mayfield* vs. *Cormier*, 8 *Ibid.*, *N. S.*, 247. *Delogny* vs. *Smith*, 3 *Louisiana Reports*, 418. *Thompson* vs. *Rodgers*, 4 *Ibid.*, 10. *Grant and Olden* vs. *Walden*, 6 *Ibid.*, 623.

22. The rights of the minors cannot be prejudiced by the neglect or omissions of their tutrix. Any deviation from the forms prescribed by law for the alienation of the property of minors, is fatal and the sale a nullity. *Chesnau's Heirs* vs. *Sadler*, 10 *Martin*, 726. *Gayoso de Lemos* vs. *Garcia*, 1 *Ibid.*, *N. S.*, 324. *Elliot* vs. *Labarre*, 2 *Louisiana Reports*, 328. *Donaldson* vs. *Dorsey's Syndics*, 5 *Martin*, *N. S.*, 655. *Fletcher's Heirs* vs. *Cavalier*, 4 *Louisiana Reports*, 270. *Delahousaye* vs *Dumartrait*, 4 *Ibid.*, 370.

23. The court erred in refusing to charge the jury as required by the plaintiffs, on the several points stated in the written charge.

*Preston*, for the defendant.

On the 27th day of May, 1818, John Poultney purchased a plantation above the city of New-Orleans, from Mrs.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

Rousseau, for the price of one hundred thousand dollars; she acknowledged the receipt of twenty thousand dollars, and Poultney gave his notes, with Messrs. Harrod & Ogden, as endorsers, at one, two, three, four and five years, for sixteen thousand dollars each, for the balance of the price stipulated.

On the 26th of April, 1819, when the first instalment was becoming due, John Poultney petitioned the District Court for a respite. He was in debt at that time, according to his schedule, (verified by his oath) in the sum of two hundred and seven thousand three hundred and fifty dollars ninety-one cents, due by him personally; and in liabilities to the amount of about fifty thousand dollars more.

To pay which, he exhibited property and debts due to him; which property, at his own estimation, and calculating all the debts, good, doubtful and bad, amounted to two hundred and thirty-seven thousand nine hundred and twenty-one dollars twelve cents. A respite of one, two and three years was accorded to him by his creditors, which was homologated by the judgment of the District Court, on the 28th of June, 1819; but this load of debt soon crushed him, and he died on the 23d of October, 1819. His succession was opened in the Court of Probates of the city of New-Orleans, by his widow.

An inventory of his succession was made by authority of the court, and his widow, knowing that his property would not pay his debts, renounced the community of acquests, on the 25th of January, 1820. She did not even apply for the administration of the succession, which she might have claimed, being the natural tutrix of her children.

So great were the debts, so insolvent was the succession, that she abandoned it, reserving her dotal rights as a creditor, making a claim against his estate, which Poultney had not mentioned, and thus showing, what is nearly always the case, that the estate was more desperate than represented by the insolvent himself.

Had she not have intentionally abondoned it, as tutrix of her minor children, she would have called a family meeting, in pursuance of *articles* 62 *and* 63, *page* 70 *of the Civil Code,*

and with their advice and the authority of the judge, have
accepted it for her children, with the benefit of an inventory.

But would any family meeting of the relations and friends of Mrs. Poultney and her children, have advised her to take the administration for her children, even with the benefit of inventory of such a succession ?

It would have occurred to any family meeting, that the plantation and other real property were mortgaged for more than what they could be sold for. The balance of the effects of the succession were mercantile claims, scattered to the four winds of the heavens, and of the whole, by any reasonable calculation, not one hundred thousand dollars could have been realized.

At least two hundred and fifty thousand dollars was to have been paid, debts certain, liquidated and acknowledged by Poultney himself, to be pressed with all the unceasing assiduity of grasping, suffering creditors, whose debts were in imminent danger of being lost.

Deliberating on such a case, every relation, every friend of the mother and children, would unhesitatingly have said, renounce this desperate succession on behalf of your children as well as yourself; the most skilful management, so far from saving any thing for them, would not enable you to pay the creditors fifty cents in the dollar. You are not obliged even on behalf of your children, to administer for your husband's creditors.

You are a woman, not even noviciated in business. This insolvent, entangled, desperate succession, would involve you in a labyrinth which men of business could scarcely unravel : there are one hundred creditors, not only distressed for the want of their money, but alarmed lest they should lose it; each one will harass you continually ; besides those, the whole tribe of marshals, sheriffs, dunners and constables, will infest your domicil from morning till night. You will not be able to sleep at night, for the new troubles each day will bring forth : this load of debt and trouble brought your late husband to his grave, and you will quickly follow him, if you assume so weighty a responsibility : yet,

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs..
CECIL'S EX'R.

if there were even a shadow of hope of saving a dollar for your children, it would be a sacred duty to undertake the task; but that is entirely hopeless: it is absolutely certain that you cannot save a dollar for your children.

Besides, there is a great reponsibility: every thing must be accounted for according to law, each one must be paid, wholly or in part, proportionately as the law directs. And yet the lawyers and judges differ as to the law, and even as to the court in which the business is to be done; and, of course, much more as to the manner of doing it. This responsibility will greatly endanger the patrimony you and your children may have, separate from your deceased husband's and their father's misfortunes. You are connected with a wealthy family; yourself and children have expectations; mingle not these with those which cannot produce gain, and may entail ruin.

Such considerations induced Messrs. Duncan and Grymes, her friends and counsellors, to advise her to, and aid her in renouncing for herself, which she could do without much form, and from the fact that a family meeting was not assembled. As to the children, we are bound to believe that it was so manifestly her duty to abandon the inheritance, in her own view, and that of all her friends, that it was unnecessary even to go through the formality, and incur the expense of calling a family meeting, and making formal renunciation for her children. All, by common consent, abandoned the insolvent succession.

But the law at the time, prescribed the acceptance in form as a mode of acquiring property, and without it, the property, did not belong to the heir; indeed he is not heir. Cresse-vs. Marigny, 4 Martin, 57. Febrero Juicios, page 100, Nos. 109, 110, 111. The law required the acceptance in form, by notarial act or judicial proceedings, as a condition on which the property should belong to the heir. The object was, in case he accepted, purely that his obligation to pay all the debts should appear of record; and in case he accepted with benefit of inventory, (in which form alone a minor could accept) that he might appear what he really

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

was, *only the administrator of the property*, until all 'the debts were paid.    The heirs in this case, did not thus become the administrators of this property, because it was manifest to their tutrix and all friends, that they could have no interest in it.    They did not, therefore, accept with the benefit of inventory, merely to administer for creditors whom it would be impossible to pay.

Thus, Poultney had died insolvent, his widow had renounced his succession, and had not accepted it for her children.   Under *article 62 page* 170 *of the old Code,* she could not be compelled to accept it for them, for in the words of that code,  "no body can be compelled to accept a succession in whatever manner it may have fallen to him, whether by testament or operation of law."    *Old Code, page* 161, *article* 71.

 "But, until the acceptance or renunciation, the inheritance is considered a fictitious being, representing in every respect, the deceased, who was owner of the estate."    *Page* 164, *article* 74.

· The estate of Poultney being thus abandoned by his widow and heirs, who were interested in it?   The creditors alone.    For example, the widow Rousseau owned eighty thousand dollars in the plantation.   It is true, the heirs of Poultney purported to have an interest of twenty thousand dollars, or one-fifth part.   But this, probably, was raised by transferring notes which belonged to his mercantile business, and which were necessary to settle that, or by giving out accommodation notes; otherwise he would not have been so entirely insolvent.   Even if he had actually paid cash, which he was worth, independent of his business, it was paid, coupled with an obligation to pay sixteen thousand dollars per annum, for five years, in order to own the land. This he could not do.   The plantation could only be sold on terms, after the greatest publicity, for sixty-nine thousand dollars; and that to the creditors themselves who held Poultney's paper, and had no other means of getting paid. None of the wealthy friends of these minors came forward to offer as much, and it crushed the creditors who gave that

43

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

sum for it. For every person who had any connexion with this then immense contract, were swept by it from the list of merchants and moneyed men ; Poultney, Torry, the Ogdens, Harrod and others, all failed.

We had then no coffee-house speculators in lots; we had but the Bank of Orleans, the capital of which would but little more than have paid Poultney's debts, and the Louisiana and Planters' Bank, which were insolvent.

Men dealt in but a few hundreds at that period, and for a small revenue ; dealers in thousands were scarcely known ; extended commerce, increased population and wealth, and the multiplication of banks, have run property up one thousand per cent. since that period. Thus the property of Madame Livaudais was run up in two years, from one hundred thousand dollars, which she asked for it, to nearly one million of dollars.

The creditors, therefore, were interested in this fictitious being, representing in every respect, John Poultney, their debtor. Old Code, 162, article 74. They were now to decide what course was to be pursued.

The estate of Poultney was, in the very words of the old Code, a vacant estate, which is thus defined, article 118, page 172 : "An estate is said to be vacant, when no person claims its possession, either as heir or under any other title ;" and the Probate Court might have appointed a curator to administer it. But no curator was appointed, no creditor would apply for, or could be compelled to take the curatorship, on account of the immense security which would have been required, amounting to at least two hundred and seven thousand dollars, besides a tacit mortgage on all the curator's property. Old Code, page 176, articles 134, 135.

The case did not exist for the application of the article 33, page 84, of the old Code, because the heirs, who had a right to succeed, had not renounced the succession. And even if the article applied, no curator could be appointed, because none would apply, being obliged to give security like other curators.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

For the same reason, the beneficiary heirs did not apply to the Probate Court, for the administration of the estate, and it is clear they could not be compelled to do so, for the same security would have been required of them. *Old Code, page* 168, *article* 107.

They could not have given it, and the estate being entirely insolvent, they had no motive, not even that of commissions for administration, which were prohibited by law, (*old Code, page* 170, *article* 116) besides the incumbrance of a tacit mortgage on their property.

In these modes, jurisdiction of Poultney's estate might have been given to the Probate Court; they were not resorted to, and no power could have compelled a resort to them.

Were the creditors, therefore, remediless? Surely not; for if there had been no provision of law, pointing out the course they were to pursue, the District Court, being one of general jurisdiction, obliged to afford redress in all cases, would have been obliged to take cognizance of this case, under article 21, page 6, of the old Code, which provides, that in "civil matters, where there is no express law, the judge is *bound to proceed*, and decide according to equity."

To this clause of our Civil Code, I have ever thought our courts have attached too little importance. It is the foundation of all equity in Louisiana, and from necessity equitable power must exist here, as well as in all other countries. The provisions of our very summary Code, can extend to but few of the innumerable and infinitely varied controversies of men. In such cases, the judiciary are, and should so consider themselves, the great dispensators of the public justice of the state, and should not deny relief because a provision of law cannot be found, affording it in the very case; but for want of the provision should appeal to their consciences for the injunctions of equity.

The utmost that can be said, is that Poultney's succession presented a case for which the old Civil Code did not provide. It was abandoned by his *widow in community.* The heirs had not accepted purely, nor with the *benefit of*

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

*inventory.* No creditor had applied for the curatorship. It was absolutely abandoned and belonged to the creditors. *Old Code, page* 468, *article* 67. " The property of the debtor is the common pledge of his creditors." They applied to the District Court for relief, for an administration by which it might be appropriated to their claims. That court could not equitably resist their application, and what better course could possibly be pursued in the absence of all law, than to order all those interested in the property to meet together, and under the control of the court, to appoint administrators to administer it, for the benefit of all concerned.

The judge of the District Court, on the petition of creditors, presented by the ablest and most experienced *counsel* at the bar, and who advised disinterestedly, because the interest of the creditors and minor heirs of Poultney did not conflict at all, as it was mere matter of administration, ordered this course. In doing so, we contend that he had no occasion to resort to his general equitable powers, but that being the only court competent to afford relief in the case, he followed the express provisions of law made for the very case. The District was the only court that could order a *consurso* of the creditors of the succession; no such power belonged to the (at that period) extremely limited jurisdiction of the Probate Court, and a *concurso* of creditors was the only proper remedy for the case, and was expressly provided for by the laws in force at that time.

" *El segundo género de concurso es el que se causa y promueve por los mismos acreedores, sin que los convoque, ni á el concurra el comun deudor, sino antes bien con total independencia suya, v. g. cuando por haber muerto presentan sus créditos en el juicio de su testamentario, y cada uno solicita la prelacion del suyo en el pago.*"

The second kind of *concurso* is that which is caused and provoked by the creditors themselves, without the common debtor calling them together, or even being present at the meeting, but rather entirely independently of him, for example, when the debtor having died, his creditors present themselves in the court, having jurisdiction of his succession, and demand their privileges in the payment of their debts.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

"*Este se llama concurso necesario y con propiedad pleyto y ocurencia de acreedores.*" And the author, in distinguising it from the voluntary *concurso*, inform us. "*que cuando se forma por muerte, y se ignora que acreedores tiene, se debe nombrar de oficio (defensor) y llamarlos por edictos, y así se practica.*" *Febrero, part. 2. lib 3, chap. 3, sec. 3 No. 39, 40.*

This is called the forced *concurso*, and with propriety the suit or assembly of creditors; and when it is formed in consequence of the death of the debtor, and it cannot be known what creditors there are, the court should name a defensor, and call the creditors by advertisement, which is the practice.

The practice thus prescribed, is precisely that which was pursued in Poultney's succession.

The succession of Poultney not having been accepted by his heirs, was abandoned, and by the Spanish and Roman Code, and laws of Louisiana, was subject to administration under authority of justice, by others than the heirs.

By the laws of Spain, which were in force when Poultney's succession was opened, his heirs were obliged to demand of the judge, the delivery of its possession *and property.* 6 *Partidas, title 44, laws* 1, 2. "Whether they claim it by will or relationship, such delivery (says the law) is very advantageous to the heir, for when it is legally made he *immediately acquires* the property of the estate."

"A minor under seven years of age, cannot of his own authority take *and acquire* the succession, but they who have him under their guardianship, may enter upon it in his name, if they think it is to his advantage to do so." 6 *Partidas, title 6, law* 13.

"A minor under fourteen years of age, *cannot acquire* an estate without the consent of his guardian, and if he has none, of the judge. If he be over fourteen years of age, he may of his own authority, enter upon and *acquire the estate*; but if after he has taken possession of it, he should discover that it was not to his advantage to retain it, he may change his mind and abandon it." Our old Code essentially accorded with these principles of the Roman and Spanish law. I

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

contend that the heirs of Poultney *never acquired* his succession, since acts were necessary to acquire it, which acts were never performed.

By inaction it was abandoned, not renounced; for if once legally renounced, it could not afterwards be accepted by an heir of age, nor re-claimed even by a minor, except by proving that he had renounced it *to his prejudice.* 6 *Partidas, title* 6, *law* 13.

The succession never *having been acquired* by the heirs of Poultney, being abandoned, can there be a doubt that the creditors to whom it in reality belonged, had a right by judicial authority to take possession of it, have an administrator appointed, and establish and satisfy, as far as possible, their claims, contradictorily with him?

If the minor who had accepted, should afterwards change his mind and abandon the property, the creditors would certainly have this right, because the judge was bound to authorise him to abandon in presence of the creditors of the estate, plainly implying that the administration then belonged to them, they alone being interested. 6 *Partidas, title* 19, *law* 7.

Now in principle, what difference is there between property abandoned by non-acceptance, and that which after acceptance is abandoned. In either case the property is to be administered for the benefit of the creditors, to whom it essentially belongs.

Property abandoned, because the heirs do not accept, is analagous to that which the debtor himself abandons, and one general mode is provided for the administration of property abandoned, by the 5 *Partidas, title* 15, *law* 2.

The *hereditas jacens* of the Roman law cannot be better defined, than by our definition of a vacant estate: "An inheritance of which no person claims the posesssion, *either as an heir* or under *any other title* ."

Now to the *hereditati jacenti*, the judge was bound to appoint a curator, which I will show, differs in nothing but the name from a syndic. *Digest, book* 3, *title* 5, *law* 13. *Curator datur hereditati jacenti.*

*Hereditas jacens interdum loco domini habeter.* *Digest, book 2,* title 1, *law* 15.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R.

The principles and practice in case of abandoned property, or that to which an administrator is wanting, are fully treated by Salgado, an eminent commentator on Roman and Spanish law. He informs us, "that when estates by any accident, want an administrator, they fall under the protection of the competent judge, because he must take care of them and put them out of danger, lest they may be lost or dissipated, and for that purpose it is his duty to appoint to the estates themselves, a faithful keeper, administrator and tutor, so that he may administer them faithfully."

"It is always in the province of the judge, to appoint a curator to the estate of an absent person or to a vacant succession, lest it be dissipated or lost. He must do it *ex-officio*, no body demanding it, if the danger of wasting comes to his knowledge.

" One thing, nevertheless, is to be considered, that the curator appointed to the property of the debtor, is sometimes called defensor, sometimes administrator ; no difference is made between them, because the doctors use indifferently these names.

" In the kingdom of Spain, he is generally named administrator, and not without reason; when the concourse of creditors mentioned, receive the administration of the property which is sequestered in their hands."

" Nevertheless, with respect to the appointment of the administrator for the property surrendered, it must be remarked what the judge must have always in mind, that the will and consent of the creditors must be followed, and if all or the majority of them have elected an administrator, he must approve and confirm him, because it is for their advantage and their utility that an administrator is elected and appointed to the property surrendered to them, and that it is principally for their interest that the property may be in safety, that it may be faithfully administered and meanwhile preserved to them, so that they may be all paid faithfully their credits."

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

From these authorities and many others, in the same and other authors, I infer:

1. That a vacant estate was to be provided with *an administrator* when no person applied to the Probate Court for the curatorship, on giving security.

2. That the judge, in the appointment, was to be governed by the will of the creditors, *in concurso*, for whose benefit the administrator was to be appointed.

3. That the administrator was indifferently called curator, administrator, defensor and syndic, the name being nothing, his office under the judge every thing. Even under the old Code, the administrator was indifferently a curator, syndic or assigneee, his business being the management of the estate. *Page* 84, *article* 34.

Now, in 1820, our Court of Probates had by express law, power to grant the admistration of estates to executors, to heirs with the benefit of inventory, and to curators who would apply for the administration on giving security; but the law cannot be found, which gave them power to order a meeting of creditors to appoint a syndic. That power was for the first time given to the Courts of Probate, by the act of 29th March, 1826, page 142. They had no power to administer an estate, which, like Poultney's, was so much in debt that no person would accept the curatorship, until that power was expressly given by article 1178 of the new Civil Code, and yet the administration of such estates, by syndics appointed by the creditors, was a common and known practice, or it would not have been abolished by article 1166 of the New Code.

The Court of Probates, thus, in 1820, being a court of limited jurisdiction, without power to order a concourse of creditors, or to administer a succession, where no person would apply for the curatorship; were the creditors of John Poultney without remedy, because his beneficiary heirs would not apply for the administration, and no person would accept the curatorship? They were not. The District Court, I will proceed to show, was a court of unlimited jurisdiction, and had not only power to afford them relief, but the

exclusive jurisdiction in the case presented by Poultney's succession.

That court was created by an act approved the 10th February, 1813. It was organised and the jurisdiction given in these words: "There shall be a court in each parish, to be held, except for the parishes composing the first district, at such times as shall be hereafter provided *for the trial of all civil cases which may* arise in the said parish, without appeal, for any amount under the sum of three hundred dollars, exclusive of costs, to consist of one judge, learned in. the law, for each district, who shall reside in the same." 2. *Martin's Digest,* page 188.

It is further provided, that " the proceedings of the said District Court, in civil as well as criminal cases, shall be governed by the acts of the territorial legislature, regulating the proceedings of the late Superior Court of the Territory of Orleans, and that *they shall have the same powers,* when not inconsistent with this act, which were granted to the said Superior Court by the said act." 2 *Martin's Digest, page* 193.

The Superior Court was created by act of Congress, approved the 26th of March, 1804, which gave to it, "original and appellate jurisdiction, *in all cases* of the value of one hundred dollars." 1 *Martin's Digest, page* 144. The act of the territorial legislature, regulating its practice, directed, " that all suits in the Superior Court shall be commenced by petition, and shall conclude with a prayer for relief, *adapted to the circumstances of the case.*" The territorial legislature did not and could not take any thing from the powers of this court, which were given by act of Congress.

On the contrary, by the act of the legislative council of the 2d of February, 1805, the said court was directed to hold its sessions " for the trial of *all suits and causes in law and equity,* of what nature soever." *Acts of* 1805 *second session,* pages 30 *and* 32.

From these laws it results that the jurisdiction of the District Court was general and unlimited, extending to every case whatsoever. The law enabled the suitor to petition before it, for any relief to which he believed himself entitled.

44

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

Accordingly, the Superior Court, and after it the District Court, from their organization, exercised undisputed jurisdiction over successions, and in suits against the curators of minors, testamentary executors, and administrators of vacant successions. The cases on record which have not been appealed or reported, are extremely numerous. I will mention some of those which have been reported.

In the case of Magdelaine against the Mayor, 1 *Martin*, *page* 200, the plaintiff claimed the guardianship of her child, before the late Superior Court. Her demand was resisted, on the ground that the defendant had been appointed guardian by the civil commandant of Pointe Coupée, in 1804. The Superior Court declared in giving their opinion that "at that time it was very doubtful whether any other tribunal than the Superior Court, sitting at New-Orleans, was competent to appoint to the office which the Spanish laws, then in force, called a *dative tutor*."

In the same volume, 1 *Martin*, *page* 71, it appears that Mercier's administratrix maintained a suit against Sarpy's administratrix for debt, before the Superior Court. In *volume* 2, *Martin*, *page* 206, it is seen that Tonnelien sued Maurin's executor, before the Superior Court, on an account for wages, without the jurisdiction being questioned. The like jurisdiction was exercised by the District Court, in the case of Cloutier *vs.* Lecompte, 3 *Martin*, 481. The defendant, as *executor of Joseph Dupré, was sued before the District Court,* for a succession and judgment rendered against him in the Supreme Court.

In the case of A. L. Duncan against Cevallos's executors, 4 *Martin*, 571, suit was brought before the District Court to rescind the sale of a slave, and recover back the price.

In the case of Le Carpentier *vs.* Delery's executor, suit was maintained on a promissory note against an executor in the court of the parish and city of New-Orleans, whose jurisdiction was concurrent with that of the District Court. 4 *Martin*, *page* 454.

In the case of Dennis *vs.* Cordeviolla, suit was brought by the attorney of the absent heirs, against the *curator* of the

estate, in the Parish Court, to compel him to do his duty as curator.    4 *Martin*, 654.

In the case of Jones *vs.* Gale's *curatrix*, the price of a slave was recovered in the District Court.    4 *Martin*, 635.

In the case of Broutin et als. *vs.* Vasquat, a will was annulled in the District Court, and this court differing from the District Court, as to some points in the case, remanded it *to the jurisdiction of the District Court for further proceedings.* 5 *Martin*, 169.

In the case of Gardiner and others *vs.* Harbour and others, suit was brought by heirs against heirs in the District Court, to regulate the effects of a will.    5 *Martin*, 408.

In the case of Maurin *vs.* Martinez, suit was maintained against the administratrix of her husband's estate.    5 *Martin*, 432.

So in the case of Franklin *vs.* Kimball's executor, suit was maintained on a promissory note.    5 *Martin*, 666.

᠆ In the case of Cusson's wife *vs.* Fulton's executor, the suit was carried on in the District Court.

In the same court suit was maintained by Marshall and wife against Marshall and wife, on a will, for the share of one of the legatees.

In the case of Donaldson *vs.* Rust, curator of Alsop's estate, suit being brought in the court of the parish and city of New-Orleans, for the proceeds of a slave sold by the Court of Probates, all the arguments which have ever been offered in favor of the exclusive jurisdiction of the Probate Court, were pressed by the counsel of the defendant, on this court, who in their decision did not even notice them, but proceeded "to give such a judgment as in' their opinion *ought to have been given in the Parish Court,*" and condemned the curator to pay to the plaintiff the proceeds of the sale of the slave, made by the register of wills.    5 *Martin*, 260.

So in the case of Labatut and others *vs.* Rogers, an ordinary and a special curator contending in the District Court for the proceeds of an estate, third persons intervened in the same court, and recovered it from both.    5 *Martin*, 272.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

In the case of Delacroix against Provost's executors, the plaintiff recovered the amount of a promissory note, in the ordinary tribunals. 5 *Martin*, 272.

So in Davis *vs.* Preval, curator, plaintiff had judgment in the Parish Court against an estate for the amount of his claim. 5 *Martin*, 254.

And Marie *vs.* Avart, was a suit against an executor, in the Parish Court. 5 *Martin*, 781.

These are some of the suits brought before the District and Parish Courts of the state, against curators, minor heirs, executors and other administrators, whose jurisdiction was recognised by the Supreme Court of the state. They might be greatly multiplied, and as to cases of the same character before the ordinary tribunals, which never came before the Supreme Court, they are innumerable, evincing the unanimous opinion of the judges of the state, of all lawyers, of all legislators, and indeed, of the whole people, that the District Courts had jurisdiction of all suits against estates, however administered.

From the organization of the courts in 1805, until August, 1822, when the case of Vignaud *vs.* Tournacourt's curator, was decided, 12 *Martin*, 229, the jurisdiction had never been doubted but in a single instance, and probably the title to half the property in the state, rested upon its exercise of jurisdiction within those periods.

We are called upon to say, that the people mistook the meaning of the law enacted by themselves, giving jurisdiction to their District Court, in simple, plain and the most comprehensive language, that every one of the distinguished judges and lawyers of the state, for a period of near twenty years, misinterpreted its simplest, but most important law. To such a call we are obliged to say with this court, in the case of Rogers *vs.* Beiller, 3 *Martin*, 670, 671 : "Practice has fixed the proper construction. The judicial and legislative authorities of the late government have sanctioned it. *Optima legum interpres consuetudo.* If it was an erroneous one, it is the case to say *communis error facit jus.* It began

Eastern Dist.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

with the organization of the American government here. The question is to be considered now at rest, and ought not to be disturbed." And with the Supreme Court of the United States, in the case of Stewart vs. Laird in answer to a similar objection to jurisdiction : " To this objection, which is of recent date, it is sufficient to observe, that practice and acquiescence under it for a period of several years commencing with the organization of the judicial system, afford an irresistible answer, that indeed fixed the construction. It is a contemporary construction of the most favorable nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course the question is at rest, and ought not now to be disturbed." 1 Cranch, 309.

The Superior Court, I have already observed, strongly indicated their opinion in the case of Magdelaine vs. the Mayor, that the Probate Court had nö jurisdiction at all, in claims against estates, and the point having been brought directly before the Supreme Court in the case of Abat vs. Songy's curator, 7 Martin, 274, this honorable court, composed of two of its members and the late governor Derbigny, decided expressly that the Probate Court had no jurisdiction of claims against an estate, and that the jurisdiction belonged exclusively to the ordinary tribunals, reversing a judgment of the Court of Probates, in coming to that conclusion, although the parties had voluntarily submitted to that jurisdiction. No lawyer doubted the jurisdiction of the District Court at that period. Many, however, believed, that it was not exclusive ; that the Court of Probates had concurrent jurisdiction. But now all were obliged, by a decision of the tribunal in the last resort, to regard the jurisdiction of the District Court as exclusive.

The decision of the Supreme Court, declaring the jurisdiction of the District Court, over claims against an estate, exclusive, and that the Court of Probates could take no such jurisdiction, even by consent, was rendered in the month of December, 1819.

The creditors of this insolvent estate, had now to decide whether to go into the Court of Probates to enforce their

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

claims against it, the Supreme Court having just decided, in the case of Abat *vs.* Songy's executor, that the Court of Probates had no jurisdiction, and should not take it even by consent, or to go into the District Court, which had by statute, jurisdiction "*in all cases*," had exercised undisputed jurisdiction in such cases, from the beginning of the government, and whose jurisdiction the Supreme Court had now solemnly decided, was exclusive. They determined to go into the District Court to enforce their claims, and not into the Probate Court; and in so doing, it is contended they entirely mistook the law, and committed a capital error, which is to ruin them and their posterity, and all those who have purchased property on the faith of those judicial proceedings, the District Court having no jurisdiction, and the judicial proceedings of the creditors, to sell the property for the payment of their debts, being utterly null and void on that account. So to decide, would destroy all confidence in the tribunals of the country, and render them an insupportable curse, instead of our greatest blessing.

My own opinion has ever been, that the jurisdiction of the District and Probate Court, was concurrent at the time of Poultney's death, as to claims against successions, and that his creditors were authorised by law, to proceed in either court. The statute creating the District Court, clearly gave it jurisdiction, and the jurisdiction of the Probate Court may be fairly deduced from the provisions of the Civil Code of 1808, and statutes cited in the case of Vignaud *vs.* Tournacourt's curator. 12 *Martin,* 229.

This court, however, have held, in the numerous cases cited by the plaintiff's counsel, that the District Court had not jurisdiction of those cases; but that they belonged exclusively to the Court of Probates. But this pervading circumstance marks every one of those cases: in every one, without exception, a representative had been appointed in the Court of Probates, who, *ratione personæ,* could be sued in the court alone which appointed him. In every one, the defendant is an executor, curator, beneficiary heir, or representative of a minor, all duly qualified in the Court of

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

Probates.    This constitutes the essential, total difference between those cases and the proceedings of Poultney's creditors against his succession, which was so situated, that no person would qualify as its representative, in the only manner in which the Court of Probates could appoint a representative, and which succession was therefore forced by its own circumstances, into the District Court.    That court alone had power to qualify and give possession of the insolvent succession to a syndic, who was the only kind of administrator that would take charge of it.    The case of Dupuy et als. *vs.* Griffin's executor, does not conflict at all with the distinction on which I insist.    In that case, Debon, the *testamentary executor*, was a party defendant, and made opposition to the order granted for a meeting of the creditors, and succeeded in having it set aside, on the ground of the want of jurisdiction in the court (the District Court) to which they applied.    1 *Martin, N. S.*, 198.    The estate was represented by an executor or beneficiary heirs, who were amenable to the Probate Court alone.    Administration having been granted in a competent court to a competent administrator, it could not be taken by another court to be given to a syndic, who I have admitted, is to be appointed to an insolvent succession, only in default of all other administration.

The case of Jenkins *vs.* Tyler, does not differ in principle. The defendant in an order of seizure, having died, the court stayed proceedings until a representative should be appointed in his place.    The case did not present any question as to how the representative should be appointed.    That only was done which was done in Poultney's succession : proceedings were stayed until a representative was appointed, in both cases.

For the appointment of curators, on giving security, the qualification of executors and beneficiary heirs and administrators, the jurisdiction of the Probate Court had become exclusive, and that for ordering a forced surrender, a *concurso* and administration by a syndic, the jurisdiction of the District Court was at that time exclusive.

EASTERN DIST.
June, 1835.

POULTNEY'S
· HEIRS
.vs.
CECIL'S EX'R.

The District Court then had jurisdiction of the claims of creditors against the fictitious being representing John Poultney in every respect, because his heirs had neither accepted nor renounced his succession, and was bound to proceed and appoint syndics to administer his estate, *in default of every other administration.*

Still, the heirs of John Poultney had a right at any time to accept the succession, and "that acceptance would have a retroactive effect, so that they would be considered as having taken possession of the estate when the succession was opened by the death of their ancestor." *Old Code, page* 160, *article* 72. "Save, however, the rights which may have been acquired by third persons, upon the property of the succession, either by prescription or *by lawful acts* done with the administrator or curator of the *vacant estate.*" *Old Code, page* 964, *article* 95.

"An inheritance refused, must be taken, such as it is, at the time of claiming the same, and the claimant shall have no right to contest any *sales* or other *acts* which may have been *legally* made, during the *vacancy* of the inheritance." *Old Code, page* 70, *article* 64.

Under the laws in force at the time of Poultney's death, there was no difference in the principles applicable to an inheritance refused, and that which was not accepted. Under the old Code, the heir was seized of the succession, only by acceptance. *Page* 70, *articles* 62, 63, 74; *page* 162, *article* 74; *page* 168.

The heir could acquire the succession only by petition to the judge. 2 *Moreau and Carlton's Partidas, page* 1020, *law* 13.

We must not be led into error in this case by the French law and new Code, which changed the whole system of our jurisprudence. See *articles* 934, 935, 936, 937, 938, 1007, *Project of the new Code, page* 114.

The succession of Poultney presented a mere question of *administration.* The heirs had not *acquired it,* were never seized of it, and did not apply for the administration with benefit of inventory, until 1833. Other administrators were

duly appointed for the administration. Did they do lawful acts of administration, by which the succession was divested of the property now in controversy? This is the only question in the cause.

The great point made is this, that the proceedings before the District Court, for a meeting of Poultney's creditors to appoint syndics, are null and void, as against the heirs of Poultney, because they were not cited, nor in any manner made parties thereto.

They could only have been cited to declare whether or not they would administer, by accepting the succession with benefit of inventory. Had their tutrix been cited, and judgment by default taken against her, it would have had no effect, because she could only have refused by authority of the judge, by and with the advice of a family meeting; and she could not have been compelled to accept at all. The citation, therefore, would have been a perfect nullity in law, and *lex neminem cogit ad vana.*

Our laws made it Mrs. Poultney's duty to act on behalf of her minor children, and they cannot now take advantage of her neglect to act in the administration of the estate, even supposing it a neglect.

The estate was bankrupt. A forced surrender was ordered, in which the bankrupt is never cited. 7 *Febrero, page* 18, *No.* 39.

The proceedings were *via executiva*, not *ordinarias*, which citation might even vitiate.

It would be absurd to require citation where the proceedings are against the whole estate, and the possession of the whole is taken. The sequestration supersedes citation.

Mrs. Poultney had opened the succession of her husband, in the Probate Court. The syndics filed their petition there for possession of the property. She did know, she was obliged to take notice of all claims in a case she herself had commenced.

She caused the seals to be affixed. She knew they were raised on the application of the syndics, and for what purpose they were raised.

EASTERN DIST.
*June,* 1835.

POULTNEY'S HEIRS
*vs.*
CECIL'S EX'R.

45

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

She caused an inventory to be made, and yet permitted the syndics to take the property. As tutrix of her minor children, she joined with the syndic in executing the judgment, putting him in possession, and aiding him to administer the property. See the two powers of attorney filed, dated 1st of July, 1821, and 18th of February, 1823, given by her with the syndics.

Had Mrs. Poultney, as tutrix, appeared in court to oppose the proceedings of the creditors, this would have been a waiver of citation. Brandt and others *vs.* Dyson, 9 *Martin, page* 497.

Appearing before a notary public, jointly with the syndic, to aid in his administration, is not only a waiver of citation, but an approval of the judgment appointing him, and of the proceedings by which he is appointed. It is also a voluntary submission to, and execution of the judgment and proceedings.

Citation is necessary to the heir in an ordinary suit, and this is the case to which the authorities from *Febrero, chapter 7, Curia Philippica,* and all the other authorities cited, are applicable.

Citation is also necessary to known heirs, before appointing a curator to an estate which belongs to them, if it can be accepted purely and without benefit of inventory. But a minor could not be compelled to accept or renounce, and could accept only with benefit of inventory; therefore, as to his rights to the property, citation could produce no effect. His renunciation or failure to accept, could not affect his property. 6 *Partidas, title* 6, *law* 20. If sold without necessity, the minors, notwithstanding the citation and failure to accept the administration, are entitled to it at any time, on accepting it in the form required by law. Until they apply, if the succession is dilapidated by mal-administration, the law provides them ample relief by the action of restitution. Applying these principles to the case before the court, John Poultney, by asking for a respite, was a bankrupt. *Old Code,* 438. *Curia Philippica,* 406, *Nos.* 1 *and* 2. *Recopilacion, book* 2, *title* 32, 62. *Ward* vs. *Brandt and others,* 9 *Martin,* 636. His heirs did not comply with the terms of the respite, and therefore, the succession, which represented him in every respect, was an insolvent succession.

EASTERN DIST:
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIE'S EX'R.

By demanding a respite of the District Court, and becoming bankrupt in that court, Poultney himself had placed his insolvent estate under the jurisdiction of that court. The respite was effectual, only by being homologated by the court. *Old Code, page* 438, *article* 5. The judgment of homologation prohibited the creditors from proceeding against him or his property, and bound him to pay them in equal instalments, at one, two and three years.

This judgment, the court alone which rendered it, had the power to execute. It constituted Poultney, merely administrator of his property, under the superintendence of the court, for his creditors. He was bound to sell and pay. He could not mortgage his property or change the situation of his creditors. *Old Code* 438, *article* 1, 468 *article* 67. *Brandt's syndics* vs. *Shaumburgh*, 2 *Martin, N. S.*, 329. If he did not pay at the terms, they could assemble and obtain relief. *Salgado, part* 1, *chapter* 1, *No.* 44. They could compel him by imprisonment to pay, depriving him of the benefit of the cession of property. *Villadego*, 53, *No.* 167.

. The heirs could take the estate only where they found it, in the situation in which their father had placed it. The District Court had under its jurisdiction the whole of it, subject to a judgment of that court.

It might be fairly doubted, if the heirs could take the estate from the jurisdiction of that court to which their father had subjected it, and in which jurisdiction the creditors had become interested, by judgment subjecting the whole estate to administration, for the payment of their debts.

At all events, the retroactive effect of their acceptance, makes them party to the proceedings and judgment in the District Court, because their father was a party; and, being a party by this retroactive effect, citation to them was unnecessary; the creditors having merely proceeded to administer the property which their father had put for administration in the District Court, and to which administration, by his death and the retroactive effect of their acceptance of his succession, they became parties by operation of law.

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R.

When Poultney died, his minor heirs were entitled, by accepting with benefit of inventory, to the residuum, after administration. *Old Code, page* 168, *article* 104. Acceptance with benefit of inventory, would also have. entitled them to the administration of the succession, which is an entirely different thing from the property. *Old Code, page* 168, *article* 104; also, *page* 166, *article* 102.

They were by law specially allowed three months and forty days, to claim the administration, by accepting with benefit of inventory. *Old Code,* 166, *article* 100 *and* 103. Their tutrix, during that period, was bound to act, if she intended to administer. *Old Code, page* 68, *article 52 and 54.* After this period, it was certainly the duty of the judge to appoint an administrator. *Old Code, page* 84, *articles 33 and 34.*

In making that appointment, it is not necessary to cite the beneficiary heirs : *First,* because it was the duty of their tutrix to act if the administration was beneficial to them. *Second,* because they could have no interest in the administration, not even commissions being allowed; but only in the residuum after administration. *Third,* because they could take the administration at any moment out of the hands of the administrator, by accepting the succession, which would have a retroactive effect, saving only the lawful acts of the administrator while the estate remained vacant. *Old Code, page* 164, *article* 95.

It is by confounding the rights of the beneficiary heir to the administration with his right of property, that we are led into error as to citation.

To deprive him of his property, his residuum, citation is necessary. To apply for the administration because he does not apply for it, and in this case was absolutely unable to take it, was an entirely different thing. The creditors applied for the administration only in default of all other applications.

And in cases of administration, no court in the state ever gave any other notice of the application, to others who might have a better right to administer, than by public advertisement.

No personal notice is ever given to the heir, of application for the curatorship of vacant estates, for letters of executorship, testamentary or dative.

I pray the court, then, not to confound a mere application for administration, duly advertised, and made in default of all other applications, with a suit for the right of property, or for debt, in which citation is necessary.

The creditors applied for administration to the court, which, by the act of Poultney, had taken jurisdiction of his bankruptcy, and which had a right to order the concurso of creditors, for failure to comply with the respite. They applied to the District Court, whose jurisdiction was unlimited. They did not apply to the Probate Court, which had no power to order a concurso until the passage of the act of 1826.

In making the application to the District Court for a meeting of creditors, it was unnecessary to cite the heirs of Poultney, or even to appoint a defensor to the estate. The estate, by the order forbidding proceedings until the meeting of creditors, was to remain in statu quo until a syndic was appointed and confirmed by the court. When thus appointed, the syndic represented the estate contradictorily with all individual creditors, and represented the heirs of Poultney, as to any residuum that might be saved for them, just as the administrator represents the estate and heirs in all other administrations.

At present the judge is authorised himself to administer a succession so much in debt, that no one will take the curatorship. Civil Code, article 1178. He is not obliged to cite heirs, to compel family meetings, to see if minors will not administer; but is to administer ex-officio, if no one applies for the administration.

What he may now do himself by express law, might well have been done under the ancient laws, by the intervention of a syndic, appointed by the creditors, and approved by the court.

The fallacy consists in applying dogmas about citation, to cases to which they have no application. They apply to suits for the rights of property or for debts, not to applications for administration.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

The minor cannot loose his rights, that is, *what belongs to him* by administration. If his property is sold without necessity or authority, he can recover it back. Even if there be mal-administration, he has his *redress;* and being able to accept at any time and take the administration, and acceptance operating retroactively, he can claim every thing but what has been alienated from necessity, and by a legal administration. This is equity in its utmost latitude.

That minors, having inherited *bankruptcy,* should recover *millions* as the representative of their bankrupt ancestor, from that severe industry and rigid economy which had purchased it on the faith of judicial proceedings, when sold by law to pay the crying creditors of the bankrupt a small dividend of their claims, and thereby ruin hundreds of minors, bring distress on whole families, and indeed a community, and destroy all confidence in the laws and tribunals of the country, would be intolerable; for it would be a case where the sacrifice of substance to imaginary forms would be too glaring to be borne. No, this court will say *fiat justitia,* even if we think that our predecessors, acting in the utmost good faith, exercising their best judgment, have erred in mere form.

The *Curia Philippica* informs us that citation it not necessary, when it appears notoriously, that no defence belongs to the person, having no right in his favor. *Page 66, No.* 22: " *Y del mismo modo no es necesario, cuando consta notoriamente, que no le compete defensa alguna á la persona, por carecer de derecho para ella.*

And what defence could be made by the heir against a judgment confessed by his ancestor, and bearing mortgage with the privilege of vendor, on the property sold for the payment of the price.

*In negotiis minorum non tam quomodo et quibus solemnitatibus, sed quid in substantia factum sit inquiritur.* Paz's Praxis, *decisiones* 13, *page* 36. *Auctoritas judicis supplet defectum citationis.* Ibid.

In the case of Keene *vs.* M'Donogh, 8 *Peters's Rep.,* 308, judgment and sale were maintained in the Supreme Court of the United States, although no citation was issued.

In the case of the lessee of Livingston *vs.* Moore and others, sales of immense property in which minors had the legal title, were held good without citation or notice, on account of the insolvency of the ancestor. 7 *Peters's Reports,* 468. See the authorities quoted in that case, at page 506 and at 522; and the legal and equitable observations of the counsel, Mr. Sergeant, at page 522, 523. The Supreme Court, in giving their opinion, which is every where full of excellent observations, finally admit, as contended for by plaintiffs, a contract on behalf of the state of Pennsylvania, to enforce its liens on their ancestor's property, only "*by judicial process:*" "but," say the court, "it may be answered, if there was, in fact, such a contract imputable to the state, the performance had become impossible by the act of God, and of the party himself, by his death, *and by that confusion of his affairs which prevented every one from assuming the character of his personal representative,*" *Ibid.,* pages 549, 550; and decided, in substance, that the titles to the property of the bankrupt, sold to pay his debts, after his death, though his minor heirs were *absent, unrepresented* and *not notified,* should not be disturbed; the minors there, as here, claiming it in consequence of an incalculable rise in the value, not through them, but by the vigor and enterprise of the purchasers.

As the estate of John Poultney presented a mere question of administration, whether by the beneficiary heirs, by a curator or by syndics, and has been administered by the latter, under the authority of a competent court, I contend that his heirs have no other action but that of restitution for maladministration. In this action they can recover only the loss which they have suffered by the negligence of their tutrix, or the fault of the syndics. 2 *Moreau and Carleton's Partidas,* page 1153, *law 2 ;* 1156, *law 7;* and must prove their damages. *Ibid.*

We do not pretend, as supposed by the plaintiffs in their 22d point, that minors can be prejudiced by the *neglect* or *omissions* of their tutrix; we only contend that they cannot gain millions by the *neglect* and *omissions* of their

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R.

EASTERN DIST.
June, 1835

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R. '

tutrix, and *gain* it from the labor of persons who have committed *no fault,* unless it be a fault to confide in the proceedings and judgments of the highest tribunals of their country.

Had their tutrix not been negligent, had she administered the insolvent inheritance of these minors, her first and most sacred duty would have been, to do that which has been done, to sell the property in controversy, to pay the price their ancestor contracted to give for it, and to save his friends, who had endorsed for that price, from ruin. No sale that she could have made, would have produced eighty thousand dollars, of which near a half was due in cash, with interest, and could she have sold it for more, the surplus would have gone to other creditors. That she could not have realized any thing for her children, is proved by her own renunciation, believing she could realize nothing. for herself. Could she in fact have sold the land for more than enough to pay the creditors, when they who were so much more interested in obtaining a high price, failed to obtain enough to pay themselves? It cannot be believed without doing violence to our reason.

Even if the plaintiffs may maintain an action of revendication, their claim is in direct conflict with the long settled jurisprudence of the country. The property in controversy has been sold under the decree of a court of general jurisdiction, to pay the debt of their ancestor, secured by privilege, and mortgage upon it. The court had jurisdiction *ratione materiæ,* and was not deprived *ratione personæ;* no administration having been granted in the Court of Probates. How much stronger, then, are the titles of the defendants, than in the case of Foucher *vs.* Carraby, 6 *Martin, N. S.,* 550, in which this court held, that a sale made by authority of the District Court, gave a good title, although the court, *ratione personæ,* was without jurisdiction of the case. How much stronger than the case of Tabor *vs.* Johnson, 3 *Martin, N. S.,* 674. See also on this point, 1 *Louisiana Reports,* 20. 3 *Ibid.,* 519. 3 *Martin, N. S.,* 605.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

It is the settled jurisprudence of the country, that a sale made by virtue of a judgment, which is afterwards reversed, is valid, even if it should be reversed on a plea to the jurisdiction, as in the case of Baillo vs. Wilson, 3 Martin, N. S., 72, 74. There can be no doubt that a sale made by virtue of the judgment, while unreversed, would be valid; and if so, how much more strongly may the defend-ants confide in a sale made in pursuance of judicial decrees and proceedings, unreversed and not annulled to the present day. We must have confidence in the judgments and proceedings of our judicial tribunals, or all confidence in society will be lost.

The principle for which I contend, prevails with regard to a will, which, when proved and registered, gives validity to all transactions founded upon it; although, when con-tested, it is declared null; and although the law declares it, for any defect of form, utterly null and void: and the acts of a curator are valid, although his appointment may be after-wards annulled. The case under consideration is far from being so strong: the beneficiary heirs have merely *succeeded* to a *previous* administration by syndics, but have never annulled that administration by suit.

We hold it to be clearly and unquestionably the law, that the heirs of Poultney cannot treat all these judicial pro-ceedings, by which the property of his succession has been alienated, as nullities, and maintain an action of revendi-cation. Perhaps they might have done so before the adoption of the Code of Practice in 1825. But that code provides, that a party to a suit, even if *not cited*, and if the court *had no jurisdiction*, cannot set aside the judgment, except by action of nullity. Code of Practice, articles 604, 605, 608, 610, 611, 612, 613. All other rules of practice have been expressly repealed, and all civil laws supporting a different practice, by the act of 25th March, 1828, *page* 160.

All judgments of record in 1828, and all judicial pro-ceedings which are the muniments of title, must, therefore, remain in full force and virtue, until annulled in the modes pointed out by existing laws of the country. Our argument

46

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

on this point is far less liable to even apparent objection, than the decision of the Supreme Court of the United States, in the case of Jane Watson and others vs. John Mercer and others, 8 *Peters, page* 88. In that case, property had been lost by judgment, on the ground that the conveyance was informal. It was recovered back by judgment; the legislature of Pennsylvania having passed a law declaring the conveyance valid, notwithstanding the informalities.

It is urged that we claim by title from Harrod & Ogden, under proceedings in the Probate Court, and therefore cannot show that plaintiffs' title has been divested. We claim nothing but to be let alone, to sit under our vine and fig tree with none to make us afraid, and by the express provision of the 44th article of the Code of Practice we are entitled "to be discharged from the plaintiff's demand unless the plaintiff make out his title." The plaintiffs show title in their father. We do not dispute that title, but show that it has been divested out of his succession; then they have no title. If the heirs can still recover from us, they do it without title, which the article expressly prohibits. It has been established as a maxim of our law, that "the plaintiff must recover by the strength of his own title, not from the weakness of his adversary's." Sassman and wife vs. Aimé, 9 *Martin*, 262. 3 *Partidas, tit.* 14, *law* 1. In White vs. Holstein, 4 *Martin*, 474, this honorable court have said "the persons claiming the estate are bound to make good their title against the legal possessor; and, in opposition, the latter has a right to set up and prove, by legal means, any title which may defeat the claim of the plaintiffs."

Even the *knavish* possessor cannot be evicted until the right of the person making claim as owner, is established. *Civil Code, article* 3417.

Now, by the foregoing judicial proceedings, we have shown that the title, by virtue of which the plaintiffs sue as heirs of John Poultney, has been divested out of his succession. They could not, therefore, maintain this suit against us if we were but *knavish possessors*.

But I will now proceed to show, that we hold by a title supported by the very letter of the law, even supposing, as contended by plaintiffs, that the estate of Poultney vested in them by his death, and that all the proceedings in the District Court were absolute nullities.

In consequence of the decision of this court, in the case of Vignaud *vs.* Tournacourt's curator, doubts originated lest the title of the plaintiffs had not been legally divested, and proceedings were commenced against them in the Probate Court of the parish of Orleans.

Charles Harrod, surviving partner of the firm of Harrod & Ogden, Georgiana F. B. Ogden, only heir of George M. Ogden, and Henry D. Ogden, only heir of Peter V. Ogden, the minors, represented by their mothers, presented their petition to the Probate Court, on the 18th of January, 1824. They set out the sale by Mrs. Rousseau to John Poultney, of her plantation, on the 27th of May, 1818, for one hundred thousand dollars, and that they are holders of three of the notes given in payment, amounting to forty-eight thousand dollars, which they had taken up as endorsers for Poultney. They set out the mortgage reserved on this plantation to secure those notes ; that the endorsers, by the act of mortgage, were subrogated to the rights of the vendors, in case they should be compelled to take up the notes.

That Poultney died the 23d of October, 1819, leaving two children, Matilda and Emily, under twelve years of age ; that his widow renounced the community of acquests, on the 25th of January, 1820 ; that she was natural tutrix of her children ; that payment had been demanded of her and refused.

They therefore prayed, that she might be cited as tutrix of her children, to answer the petition, and decreed in her capacity to pay to them the said sum of forty-eight thousand dollars with interest and costs; and in the mean time, that the mortgaged property might be seized and sold, according to law. The petition was signed by Samuel Livermore, as counsel. The affidavit of Francis B. Ogden was annexed, attesting the material allegations set forth in the petition,

EASTERN DIST.
June, 1855.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.
averring that the heirs of John Poultney, named in the petition, were justly indebted to the petitioners, in the sum of forty-eight thousand dollars, exclusive of interest, and that no part thereof had been paid.

The following order was made on the petition :

" Let the defendant be cited to answer the within petition, and let the mortgaged premises be seized and sold by the sheriff, according to law.

" New-Orleans, January 17th, 1824.

(Signed)                              JAMES PITOT, Judge."

Citation was issued to Mrs. Poultney, accordingly, and the sheriff made return in these words :

"Served copy of petition and citation, and also, of the within order on the widow Poultney, by leaving the same with John R. Grymes, Esq., her attorney.

" January 26th, 1824.

"Returned same day.          G. W. MORGAN, Sheriff."

An order of seizure and sale issued, in pursuance of the order of the court, against the plantation. It is dated the 22d of January, 1824, and signed by Martin Blache, the register of wills.

The sheriff returned said writ, that he seized the plantation, describing it particularly, and after stating the sale of a certain part divided into lots, declares, that " on the 23d of February, 1824, having exposed the remainder of the plantation to public sale, according to law, on the same day, Charles Harrod and F. B. Ogden became the purchasers thereof, for the price of twenty-seven thousand dollars," and that he left the proceeds in the hands of the plaintiffs, they having obtained judgment for forty-eight thousand dollars, in this court, on the 6th of March, 1824. The return is dated the 24th of April, 1824, and signed by George W. Morgan, sheriff.

These proceedings conform exactly to the literal provisions of our former laws.

The old Code, page 460, article 40, prescribed them precisely, especially when we consider that the succession,

until accepted or renounced, represented in every respect, the deceased, to whom it belonged. That article authorised the creditor, having "a title amounting to a confession of judgment, on his oath that the debt was due, to obtain from the judge *an order for an immediate seizure of the thing mortgaged.*" The act of 1817, page 34, section 14, enacted, "that in no case, except in cases of judgment by default, it shall hereafter be necessary for the sheriff to give notice to pay the money due on an execution, before proceeding to levy on the same; and that no sale of immoveable property, seized by the sheriff, shall be made in less than thirty days from the first advertising. And if, on the day so appointed for the sale, the money due by said execution, and legal charges be not paid, the sheriff shall proceed to sell the property seized, to the *highest bidder*, for ready money, or for such term or credit as the plaintiff may, in writing under his hand, direct.

But it is objected to these most formal proceedings, conducted by an eminent counsellor, for the very purpose of making a good title to the property in controversy, that the order of seizure was illegally issued against the plantation mortgaged by John Poultney, without having the title declared executory against his heirs.

The title was equal to a judgment. It was a judgment confessed, and to be executed against a particular property, which was mortgtaged, and which property represented John Poultney, in every respect.

The articles of the *old Code, page* 200, *article* 229 and *page* 498, *article* 7, relied upon in support of the plaintiffs' objection, apply in express terms to the case where the creditor wishes to execute a judgment rendered against the deceased, not against the *property of the succession*, but against the *person* or *estate* of the heir. To render the heir personally liable, or his property, independent of that derived from his ancestor, the law required personal proceedings against him. In order to render him or the estate which he held, independently of his ancestor, liable for a debt of the ancestor, it was necessary to show that he had accepted the succccession, and that he had

EASTERN DIST.  accepted it purely, *old Code, page* 162, *art.* 72 ; *page* 164, *art.*
June, 1835.  86;  and not with the benefit of inventory, *page* 166, *art.* 97,

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R.

The law, as applied to the present case, meant simply that the widow and minor heirs of Poultney could not be imprisoned by a *capias ad satisfaciendum,* although their insolvent ancestor might, nor could be turned out of the house they held independent of him, by execution, because if the creditor wished to execute his judgment against them and their property, he was obliged first to cite them, to which citation the widow could successfully answer, that she had renounced the community of acquests ; and the minors, that they had accepted only with the benefit of inventory, rendering the property of their ancestor alone liable for the debt.

The first article relied upon has been changed, the last omitted in the *new Code,* and the mode of proceeding expressly provided for by the *Code of Practice.* The change, omission, and the mode of proceeding prescribed, all prove the correctness of the construction of these articles, for which we contend. The article 229, page 200, of the old Code, has been thus changed :

" Titles which carry execution against the deceased, are also executory against the heir personally; nevertheless, the creditors cannot obtain execution on them, until ten days after the notification of them be made to the person, or left at the domicil of the heir." *New Code, article* 1395.

" The heir on being notified thereof, may oppose the execution, before the tribunal having cognizance of the matter, on his simple motion ; and if he proves that he has claimed the delays for deliberating, the execution shall be suspended until the delays have expired." *New Code, article* 1396.

The object of these provisions is evident, to enable the creditor to render the heir personally liable.

The object of the citation is evident, to enable the heir to show that he is not personally liable. If the creditor shows that the heir has accepted the succession, " he may act against that heir, in the same manner as he would have

done against the debtor himself." The whole object of these provisions, and those of the old Code, is to render the heir personally, and his property individually, not that which he holds as heir, liable for his ancestor's debt. The articles 1397, 1398, 1399, 1400, 1401, 1402, 1403, 1404, 1405, 1406, 1407 of the new Code, and article 230, page 202 of the old ·Code, ·all show conclusively, that the meaning for ·which I contend, is not only the literal meaning of article 239, page 200, and article 7, page 490, of the old Code, but that it is the meaning indicated by the whole spirit of our law on the subject. ·And the observation in the case of Legendre vs. M'Donough, 6 Martin, N. S., 514, to establish a contrary meaning, so far from being a decision of the court, is not even an obitur dictum, but a mere casual remark, by way of illustrating an argument.

EASTERN DIST<br>June, 1835.<br><br>POULTNEY'S<br>HEIRS<br>vs.<br>CECIL'S EX'R.

Citation, in this order of seizure, to the heirs of Poultney, was not necessary ; indeed, had the citation been served, it might have converted the proceeding from the via executiva, to the via ordinaria, had the heirs appeared and required it. 3 Martin, N. S., 500. 8 Ibid., 96.

The sheriff returns, that he seized the property on the 22d of January, and on the 23d of February, 1824, sold it, according to law, and left the proceeds, deducting charges, in the plaintiffs' hands, to whom it was due by judgment rendered in the Probate Court, the 6th of March, 1824. The· sheriff's return and deed proves every thing legally done, unless the contrary be proved. Lafon vs. Smith, 3 Louisiana Reports, page 476. Therefore, the property was duly advertised and appraised, and the proceedings, as prayed in the petition, carried on contradictorily with Mrs. Poultney, the mother and tutrix of the minors Poultney, who was obliged, as far. as they had any interest, to represent it, in a judicial proceeding. Old Code, page 74, article 81, No. 4. Ibid., page 54, article 55.

Under these proceedings, which are in the most perfect form, Charles Harrod and Francis B. Ogden, as the sheriff's return and deed prove, acquired all the rights, title and

EASTERN DIST. interest of the minor heirs of Poultney, to the property in
*June*, 1835. controversy.

POULTNEY'S        The act of 1817, relied on by plaintiffs, in terms regulates
HEIRS
*vs.*         proceedings in the Probate Court, but takes no jurisdiction
CECIL'S EX'R.   from the District Court.   The provision contained in the act
directing the immoveable property of vacant successions not
to be sold until a year after it is opened, and the various
other laws prohibiting the alienation of minors' property, do
not conflict with the proceedings in Poultney's succession ;
for, by an act of 1809, which is unrepealed and still in force,
it is declared, that the provisions of law " which go to prohibit
the sale of the estate of minors, in certain cases, or to
authorise the sale only if it should amount to the estimated
value of said estate, shall not be construed to affect such
sales as shall be forced upon minors, when the estate of said
minors is seized by virtue of a decree of a court of justice, or
otherwise." 3 *Martin's Digest*, 130.   And by an act passed
in 1811, it is said again, " that nothing in the act shall
prevent any sale of minors' property, should said sale be
necessary for the payment of the debts of the estate."
3 *Martin's Digest*, 134.

Prescription also bars the claim of the plaintiffs in this
suit.

The creditors of John Poultney, by their syndics, were put
into possession of the property of his succession, by an order
of the District Court, on the 4th of April, 1820.   They had
petitioned, and in effect obtained the order of the Court of
Probates, for the same purpose, on the 23d of March, 1820.
They and their vendees have held the property, believing
their title good, ever since.   The suit of the heirs of
Poultney, against William Cecil, was commenced on the 3d
of December, 1832, more than ten years after the creditors
of Poultney were put into possession of his estate ; also, more
than ten years after the property now in dispute, had been
sold by the sheriff, to George M. Ogden, which sale took
place on the 13th day of June, 1820.

Now, the estate of Poultney was either vacant, no person
having claimed its possession as heir, or under any other title,

Eastern Dist.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

old Code, page 175, article 118; or, if it belonged to the heirs of John Poultney, it belonged to them as heirs who had not yet accepted it.    Old Code, page 70, article 62.

In either case, prescription runs in favor of the possessors of the property, old Civil Code, page 486, article 62, latter clause, new Code, 3492, "prescription runs against a vacant estate, though no curator has been appointed to such estate."

So, also, prescription runs against an estate, the heirs of which have not yet accepted it.    The heirs of Poultney might, and did accept their father's succession, in March, 1833, more than ten years after his creditors had been put in possession of the property in controversy, and had caused it to be sold by a competent court.    Now, our old and new Codes prescribed " that the heirs might, at any time, accept the inheritance, without prejudice however to rights which may have been acquired by third persons, upon the property of the succession by prescription," new Code, article 1024.    Old Code, page 164, article 95 ;  page 70, article 64.    These laws are reconcilable with those which provide that prescription shall not run against minors.    As to property acquired by minors, prescription does not run ;  but as to their right to that which has been abandoned by their representatives, which has never been acquired by them, prescription does run in favor of third persons.

Those, therefore, who held in good faith under the judicial proceedings in 1820, acquired before the institution of this suit, a title by prescription against the heirs of John Poultney.

The argument, that the introduction into our new Code, of the principle of the French law, " que le mort saisit le vif," interrupts the prescription, is utterly untenable.    "A law can prescribe only for the future, it can have no retrospective operation," new Code, article 8.    The principle can only apply to an inheritance which devolves by a death, subsequent to the passage of the new Code.    The defendants bought their property on the faith of the existing-law of prescription ;  it made part of their contract in buying, as much as if embodied in the bill of sale ;  and in this unhappy community, we may

47

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

consider the law of prescription the most important part of a contract for the purchase of real property.

Besides, I have to observe, that the old principle, so far as minors are concerned, is retained in the new Code, *verbatim*. He can accept an inheritance only with the benefit of inventory, by authority of the judge, on the advice of a family meeting. *Louisiana Code*, 345, 346. The practice conforms to these articles, for the plaintiffs in 1833, complied with all the formalities they prescribe, in order to maintain this suit.

In the course of the foregoing argument, I think we have successfully combatted or destroyed the effect of the 1st, 3d, 4th, 5th, 6th, 9th, 17th, 18th, 20th, 22d, and 23d points made by the plaintiffs; and on due consideration of our argument, the court will see that the 7th, 8th, 12th, 14th, 15th, 16th, and 18th points made by the plaintiffs, are immaterial, or have no bearing on the merits of this case.

The principle advanced in the third point we admit, and have shown, that the property in controversy has been divested out of the succession of John Poultney, by lawful acts.

As to the 10th point, we contend the property was advertised and sold according to law. The order directing the sale, was made on a petition drawn with the utmost care by Mr. Livingston, the greatest lawyer that ever practised at this bar, and unsurpassed at any bar. It is dated the 9th May, 1820, and was notified the 10th.

The sale took place the 13th June, 1820, allowing full time to advertise and comply with all the formalities of law, and the sheriff's return is full evidence, until disproved that those forms were observed. Lafon *vs.* Smith, 3 *Louisiana Reports*, 473. Consent, judgment and sale on credit for the benefit of all concerned, may legally dispense with appraisement.

And on the 11th point I have to observe, that as the syndics had a right to sell, through the intervention of a public officer, the court had a right to order the sale by

the sheriff, on an application against the syndics. So far from resisting the order, they spread their consent on the record.

In the 13th point, the principle of the laws of Spain are mistaken; it was only the pledge in his own hands, that the creditor could not purchase. *Moreau and Carleton's Partidas*, 839, *law* 44. Besides, the *remate* of the Spanish law had been superseded in our statutes, by special executions.

In introducing the common law executions into our system, we introduced them with all their principles. *The creditor could buy on a common law execution*, and our statute directed the sheriff to sell to the "*last and highest bidder*." The statute makes no exception. All may bid who are capable of contracting. There is no reason for the exclusion of the creditor; his bid is advantageous to the debtor, and his right to bid has been admitted in practice ever since the change of government. The article 688 of the Code of Practice, did not introduce a new, but like almost all the articles of the Code, reduced to writing the old and legal practice.

The fallacy of this suit consists in supposing that we understand laws by which our predecessors were governed, better than they understood them themselves, although they have been changed, and we are governed by an entirely different system; but on a minute examination, we have found that our predecessors, now no more, pursued *the very letter*, and perfectly understood the spirit of the existing laws. Had, however, scrutiny pointed out errors in their proceedings, we might have said with confidence, they acted in good faith, to the best of their judgment; they did that which was substantially right. They sold the property of a bankrupt for its full value, to pay his debts. Hundreds have vested the toil of their lives and the hopes of their children, on the faith of these judicial proceedings of their courts, where, if confidence cannot be reposed, we are cast upon the ocean of uncertainty, without a helm to guide us to port. We might have appealed to justice and equity, which would have cried to heaven in our behalf, and have said with

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

truth, "naked law, insupportable law alone, sanctions the unjust and unequitable claim of the plaintiffs."

If, instead of the fictitious being representing John Poultney, which we have so often presented to the court, he could rise from the dead, himself, I cannot but think his spirit would rebuke this suit.  He would proclaim that he left nothing but bankruptcy in this world, and no wish behind him, but that his insolvent succession might be sold to indemnify his suffering, generous, confiding endorsers, and that his widow and children might not mingle in his misfortunes.  And, on the plea of prescription, perhaps his departing shade would warn us, in the language of a great jurist: "As men are mortal, let not litigation be immortal.

*Strawbridge*, for Harrod, called in warranty, argued generally for the defendants, from the following points :

1. Amongst the points filed by the plaintiffs, the 6th, 7th, 8th, 9th, 12th, 18th, 21st and 22d refer to nullities or errors, which do not *ipso facto* render a judgment void, cannot be inquired into collaterally between the same parties ; but can only be corrected by way of appeal.  11 *Martin*, 607.  4 *Ibid.*, 414.  8 *Ibid.*, 178. *Louisiana Reports*, 21.  3 *Ibid.*, 520.  7 *Ibid.*, 36.

2. Purchaser at sheriff's sale, not affected by any irregularity in judgment or in former proceedings.  11 *Martin*, 607.  4 *Martin, N. S.*, 456.  Even when judgment was reversed, sale held good.  5 *Martin, N. S.*, 213.  See also, 7 *Martin*, 226, 246.

3. As to the irregularities after judgment, as referred to in plaintiffs' 11th and 20th points, it is merely an error in dates ; the order in the first case, was made 8th May, 1820 : the execution issued next day.  On the 31st May an amendatory order was made by consent, dispensing with appraisement, and fixing a credit ; the sale took place June 13, thirty-five days after.  In the second case, the order of seizure issued 18th January, being thirty-six days previous to sale.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

4. *Jurisdiction.* By laws of 1804, page 80, Superior Court had jurisdiction in all civil causes; which powers were afterwards transferred to the District Court. 2 *Martin's Digest*, 188, 192.

The Parish Court, though its jurisdiction has been frequently altered and extended, never possessed any exclusive jurisdiction until the Code of Practice.

In Donaldson *vs.* Rust, 6 *Martin*, 260, when the right of jurisdiction was contended to be in the Probate Court, the argument was not noticed.

In Abat *vs.* Songy it was held that the Court of Probates had no jurisdiction of claims against a succession. 7 *Martin*, 274.

In Casanovichi *vs.* Debon, it was questioned whether it could compel an executor to account. 10 *Martin*, 12.

Yet in Vignaud *vs.* Tournacourt, 12 *Martin*, 229, on which plaintiffs rely, it was said Courts of Probates had exclusive jurisdiction.

Since then, in Tabor *vs.* Johnston, 3 *Martin*, *N. S.*, ——. Skillman *vs.* Lacy, 5 *Ibid.*, 50; Foucher *vs.* Carraby, 6 *Ibid.*, 548; Donaldson *vs.* Dorsey, 7 *Ibid.*, 376, the current has been setting back, and by these and many others, it is clear that the District Court is not without some jurisdiction in these matters.

The project for the *new Code*, where article 1159 is introduced, shows by the note what the redactors thought of these things.

5. *Citation* is necessary to begin a suit. Here the suit was commenced in Poultney's lifetime, he swore to his schedule, his creditors to their respective debts, the court homologated the proceedings. Is this not a judgment? And for what are his heirs to be cited? It is said to have the judgment declared executory; but this is not an error which renders the judgment null.

Citation is not necessary in granting administration; the law did not require it then, and does not now. A curator must advertise ten days; an executor is confirmed, or an administrator made without calling in any one. And this is

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

not a forced surrender as called, but merely the appointment of an administrator.

. With regard to the 19th point of plaintiffs, respecting Mr. Grymes's authority, it does not follow that because a party may appear in this suit where an attorney is acting, and deny his authority, that they can do it in a suit circumstanced as this was. It would be to make plaintiff a witness in his own cause.

Beyond this, enough appears on the record, to show Mr. Grymes was the attorney: he acted as Poultney's attorney in his lifetime; he acted for his syndics; but, above all, he acted as the counsel of Mrs. Poultney, in *taking the inventory* which he has, in her presence, signed in three several places: he acted as her counsellor in the renunciation of the community; and he is now acting as her attorney in this suit. Her affidavit, if admitted, cannot controvert these things.

6. In addition to the grounds assumed in our first point, since the Code of Practice, by article 556, the only modes by which judgments can be reversed, are: 1. New Trial; 2. Appeal; 3. Action of Nullity; 4. Action of Rescission.

By article 606, want of jurisdiction in a court; want of citation, &c., are made causes of nullity to be sued for in this action, and by the law of 1828 all other rules of practice are abolished.

Harrod, last called in warranty, demands a rescission of the sale for non-payment of the price, as well under act 2539, *Louisiana Code*, as the express stipulations of the sale, also *Louisiana Code*, 1920, 2041–2.

Endorser subrogated to vendor's right, may rescind sale. 2 *Martin, N. S.*, 159.    3 *Ibid.*, 314.    See also, 7 *Ibid*, 400. 2 *Ibid.*, 519.    10 *Toullier, chapter 6, section 3, article 1, No.* 492, &c.

Right of rescission indivisible.    6 *Toullier, page* 806, *No.* 778, and contract, gives vendor's rights to endorser, paying any of the instalments.

EASTERN DIST.
June, 1835.

POULTNEY'S
. HEIRS
vs.
CECILS EX'R.

*Mazureau*, on behalf of Wm. Cecil, in conclusion.

May it please the court, it is not my intention to take much of your time, after the long and able arguments which you have already heard. This cause is, certainly, as it respects the amount of property and the number of persons that are to be affected by its final decision, one of the most important ever brought before you; but, in my humble conception, few, very few questions are necessary to be examined into, to enable your honors to pronounce a just, a correct sentence. Such was my opinion from the very first moment that I was consulted by my client; and, after having read the twenty-three points, which have been filed by the adverse counsel, I remain confirmed that it was correct, and that they might of course have spared to themselves the trouble of searching for and referring us to the numberless authorities they have quoted in support of them. I expressed that opinion and went somewhat further: I said, that the few questions on the solution of which depends the judgment of this mammoth cause, must be decided in favor of the defendant; that law, justice and equity, are most clearly on his side; and that nothing but a total error as to the laws by which we are to be guided could, for a moment, lead any disinterested and well informed lawyer into the belief, that the plaintiffs had any reasonable chance of success. Was all this error or presumption in me? The court will shortly be enabled to decide.

I shall not trouble the court with any statement of facts of my own. I am perfectly satisfied with the one furnished by the plaintiffs with their printed points; I shall, therefore, enter at once, into the legal merits of the cause. Let me be allowed, however, to remark, that the first point made or presented on behalf of the plaintiffs, conveys an idea which is somewhat incorrect. That point says:

1. "The defendants claim a title derived from the ancestor of the plaintiffs. They consequently cannot contest its validity, nor set up an outstanding title with which they do not connect themselves. The burden of the proof is with them, to show that the title of the ancestor has been legally divested."

Eastern Dist.
June, 1835.

Poultney's
Heirs
vs.
Cecil's Ex'r.

As to my client in particular, I say, may it please the court, that he CLAIMS nothing. He is sued and defends himself. The plaintiffs *claim* the property which he is in possession of, and in his answer to their petition, he first denies that they have any right or title to it. He in the next place avers, that the estate or succession of John Poultney, the father of the plaintiffs, has been legally divested of the property which they claim from him. Then he adds, that he has *bonâ fide* purchased the said property, from a person who is bound to defend and warrant him, and prays that his vendor may be cited to that effect. Such is the defence which I propose to make good.

How does it stand in point of fact?

Let us open the printed statement made by the adverse counsel, and we shall see, page 2, that on the 13th of March, 1820, George Lloyd, Henry Foster and P. V. Ogden, were, at a meeting of the creditors of John Poultney, deceased, ordered by the First District Court of this state, appointed syndics of the said creditors; and that on the 14th, they were authorised by an order of court, to take possession of the property, and sell the same according to law. We shall see further, page 3, that the property was sold by the sheriff to George M. Ogden, pursuant to an order of the court, made on a certain hypothecary action brought against the said syndics, on the 13th day of June, 1820.

From these plain facts, ought not the plaintiffs to be at once turned out of court, and judgment entered in favor of the defendant?

The decision of this question, depends only on the solution of the two following, to wit:

1. Are the proceedings and the orders of the District Court, respecting the *concurso*, delivery of possession and sale, valid?

2. Are the proceedings before the same court, and the order of seizure and sale granted against the syndics, on the executory or hypothecary action of George M. Ogden, Peter V. Ogden and Charles Harrod, and in consequence of which the above alluded to property was sold, good and valid in law?

As to the first of those questions, the plaintiffs contend :

1. That the District Court had no jurisdiction.

2. That the minor children of John Poultney ought to have been cited to answer the petition, praying for a meeting of the creditors; that no citation ever issued, or ever was served upon them; and that they were in no manner made parties to any of those proceedings: for which reasons they say all the proceedings of the *concurso* are null and void, and they were never legally divested of the property in dispute.

They contend, as to the second question, that the sale made by the sheriff, on the 13th of June, 1820, to George M. Ogden, from whom the defendant derives his title, is null and void, because :

1. The District Court was incompetent, and had no jurisdiction of claims for debt against the estate of a deceased person.

2. No order of seizure and sale could issue, until the act importing confession of judgment, had been declared executory against the heirs.

3. The order of seizure and sale issued irregularly, because the parties applying for it, prayed at the same time for citation and judgment against the syndics, which was an abandonment of the *via executiva*.

4. Mrs. Poultney was never served with a citation.

Let us examine the two questions, and the propositions contended for by the plaintiffs, separately.

As it is contended on both questions, that the District Court had no jurisdiction, and could neither order a meeting of the creditors of the deceased, nor take cognizance of an action of debt against his succession, what I am now going to say respecting the jurisdiction, will apply to the one, as well as to the other of the cases.

I say, may it please your honors, that the District Court had jurisdiction; and that it is a palpable error to deny it and to contend that the Court of Probates was alone competent.

Have the counsel for the plaintiffs forgotten, that the statute of 1813, organizing "the Supreme Court of the state of Louisiana, and establishing courts of inferior jurisdiction,"

48

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

says, section 16 : " that the proceedings of the said District Courts, in civil as well as criminal cases, shall be governed by the acts of the territorial legislature, regulating the proceedings of the late Superior Court of the territory of Orleans, and that they shall have the same powers," &c. ?

Does not this statute most clearly give the District Court the same jurisdiction which the Superior Court of the territory had ? If in saying that the proceedings in civil cases should be the same, and the *powers* the same, the legislature meant to say that the jurisdiction should be different, I wish I may be informed, in what manner it could provide that it should be the same. I may be answered, that the idea or intention, would have been better expressed, if, instead of the language made use of, it had said in fewer words, " the mode of proceeding in the said District Courts, and their jurisdiction, shall be the same as the mode of proceeding and the jurisdiction of the late Superior Court of the territory of Orleans." But I would ask if any other meaning can reasonably be attached to the statute, as it is, than that expressed by the words I have just uttered and put together. Until this is satisfactorily shown to me, I shall, as I do, contend that the statute of 1813, gave to the District Court which it created, the same jurisdiction, which the late Superior Court of the territory had.

Our next inquiry must therefore be, would the Superior Court have had jurisdiction of the matters which are the subject of the present controversy ? I say yes ; because by the act of Congress creating it, section 5th, Congress had given it jurisdiction of all cases where the thing in dispute, exceeded in value, the sum of one hundred dollars. And as to the Court of Probates, which was created by an act of the governor and legislative council of the territory, approved on the 3d of July, 1805, posterior to the act of Congress just alluded to, can it be said that it had any jurisdiction at all, of the matters which gave rise to the present controversy ? I deny it.

Let us look at the act of 1805, just referred to, and we shall see that the Court of Probates was vested with the power of

opening wills, granting testamentary letters, and letters of administration, and with no other. It had not even the power of appointing tutors or curators.

EASTERN DIST.
*June*, 1835.

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R.

Let us next open our old Civil Code, which was in full force at the time of, and long after the death of John Poultney, and consequently when the proceedings were had, the nullity of which is contended for by the plaintiffs.; we shall see that the Court of Probates is not even mentioned in any part of it. Vainly would we look into it therefore, to find any provision giving to that inferior court any jurisdiction at all; unless the word JUDGE which it uses wherever it treats of tutors, curators, successions accepted under the benefit of an inventory, administration of vacant estates, testamentary executors, &c., be made to signify *Court of Probates*; which I presume will not be attempted, even in this age of wonders. But admitting that *judge* means *Court of Probates*, does it also signify, that exclusive jurisdiction of the matters under consideration is given to it? And if it does, what of it? Could the legislative council, or the legislature of the territory of Orleans, as long as that form of government existed here, pass a law giving such exclusive jurisdiction to the Probate Court? I humbly presume they could not. The Superior Court, organized here by an act of Congress, held its jurisdiction from an act of Congress. Could that jurisdiction be taken from that court? No doubt that it could; but by what authority? By an act of Congress and not by an act of our territorial legislature. Am I not safe, therefore, in saying, 1st. that the jurisdiction contended for, was never given to our Court of Probates. 2d. that if it had been given by any law of our own making, it would not have divested the Superior Court of a particle of its own power or jurisdiction?

Let us recollect that in December 1819, the Supreme Court of the state of Louisiana have, in the case of Abat et al. *vs.* Songy, 7 *Martin*, 277, decided and declared, that the Court of Probates could not take cognizance of a suit brought against a succession.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

Let us next bear in mind that one month had hardly elapsed after that solemn decision, when Messrs. Duncan and Grymes have, in the name of three of the creditors of the deceased John Poultney, presented to the District Court, a petition, praying for a meeting of all his creditors, in order to have syndics appointed for the purpose of administering the estate *for the benefit of all concerned.*

If it is contended that the District Court was incompetent, to what court could those parties apply? to the Court of Probates? Certainly not; for the decision in the case of Abat *vs.* Songy, would not have justified such a step. Were they to apply to the Parish. Court? no such thing will, I hope, be dreamed of. They were undoubtedly to apply to the District Court; they could apply to no other.

But, say the plaintiffs, the Supreme Court have in the case of Vignaud *vs.* Tournacourt, decided that all suits or actions against a succession must be brought before the Court of Probates and not in the District Court. True it is; but when was that decision made? in August, 1822. Now, I ask every man in his senses, who is not blinded by prejudice or interest, if any argument against the validity of the proceedings had in our case, can be reasonably drawn from that decision?

What! when I see in January, 1820, that in the preceding month of December, the supreme judicial tribunal of the state have solemnly declared, if not to all the world, at least to me and my fellow citizens, that the Court of Probates had no jurisdiction of suits brought against a succession, am I to imagine or presume that they were wrong? Am I to foresee that twenty months thereafter they shall change their mind, although the law is not changed, and declare that the Probate Court has exclusive jurisdiction?

May it please your honors, I will not presume to criticise the decision rendered in the case of Vignaud *vs.* Tournacourt. I will not undertake to say that it was founded in error; but I will candidly tell you that I was much surprised when I read it. I went perhaps too far, when I said, that at the

time it was pronounced, the law had not been changed. I

know that on the 18th of March, 1820, an act of our state legislature was approved, which gave jurisdiction to the Court of Probates in all cases relating to the proof and execution of wills, the appointment of curators of vacant estates, absent heirs, minors, and other persons tutors of minors, the settlement, liquidation and partition of successions, the liquidation and payment of all claims against a succession, either vacant or accepted, under the benefit of an inventory, &c.

But the passage of this act, which was not promulgated until three months after its date, proves most conclusively, to my mind at least, that, had it not been for its enactment, the Court of Probates would have had no jurisdiction. It is clear to my conception, that in December, 1819, January, February, March, April, May and June, 1820, such jurisdiction did not exist in that court; for I believe I may safely say, that until a law is promulgated, it is not in force, nor is it binding upon any person. I therefore feel confident, that proceedings had in the District Court before its passage and promulgation, can in no manner be affected by any of its provisions.

Can it be said that I am wrong in this? I believe I can even go farther, if this statute is properly understood. Let us read it. It says: "The Court of Probates shall *have* jurisdiction," &c.; not *exclusive* jurisdiction; let us bear it in mind. I say, that as the jurisdiction was already vested in the District Court, the statute, worded as it is, did not take it away from it; that it kept it concurrently with the Court of Probates, to which, for the first time, the law gave it. Such is, in my humble opinion, the only just construction that can be put upon the act of March, 1820. To make it say, that the Court of Probates was to have *exclusive* jurisdiction, when it only said, "the Court of Probates shall have jurisdiction," would be going somewhat beyond the power of construing it; it would be a usurpation of the power of amending, which, thanks be given to God, our constitution has not given to the judiciary branch of our government. I am, therefore, confident that the court will agree with me, in declaring, as I do, that not only prior to, but even after the

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

passage and promulgation of the act of 1820, the District Court had jurisdiction of all the matters which are the subject of the present controversy.

This is not all, may it please your honors; I say that if it were possible that you could differ with me on these points, you would still be bound to declare that all the proceedings are legal and valid; and I will now proceed to demonstrate it.

Let us recollect that, prior to his death, John Poultney, finding himself unable to pay his debts, was reduced to the necessity of going into court and to apply for one of the remedies provided by our laws for the relief of debtors in failing circumstances.

He made his *bilan* and filed it in the District Court, with a petition praying for a meeting of his creditors, in order to ask from them a respite. The *bilan* being sworn to, the District Court ordered the meeting prayed for; and, at the same time, did, according to our law, order a suspension of every proceeding both against the petitioner and his property. The meeting did accordingly take place; the respite was granted; and the deliberations had on the subject, by the creditors, were, on the application of the petitioner, homologated by the court.

Now, pending the respite, and before the expiration of the first instalment, John Poultney died, without having paid a cent of his debts.

Under these circumstances, I say, that the creditors, or any other person connected with the proceedings of the respite, could for no purposes whatever go to any other than the District Court.

Your honors know, as well as myself, that a *respite* is always, if not with respect to all, at least with respect to some of the creditors of the insolvent, a delay which they are compelled to grant him: when the majority consents, the minority is forced to submit to it. But, may it please your honors, upon what condition is it that the law tells a creditor: "Thou shalt not trouble thy debtor for the payment of thy claim, until after the expiration of the. time granted to him by his other creditors?" It is upon this

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

condition, that the insolvent, who has obtained the respite, shall pay all his creditors at the expiration of the delay. Does not the insolvent, when he goes to his creditors, before the notary, tell them: gentlemen, I am unable at present to pay you; but if you will give me some time, say one, two, and three years, I promise to pay you all? So he does. Then the creditors deliberate, and, after the vote of each is taken separately, those votes are counted. An act is drawn by the notary, and signed by him and all the parties; that act is returned into court; and, on the filing of it, and on a motion of the insolvent, public notice is, by the court, ordered to be given to all parties concerned, to show cause, within a certain delay, why the proceedings should not be homologated. If sufficient cause is shown, no *homologation* takes place, the respite is not granted. If, on the contrary, no cause or insufficient cause is shown, the proceedings are homologated, the respite is granted; and the stay of proceedings ordered on the filing of the insolvent's *bilan*, is extended to the last day of the term or delay fixed by the majority of his creditors. During that term or delay, and as long as the stay of proceedings is not set aside, the dissenting minority of the creditors have their arms and tongue tied up: they can neither act or speak against the debtor in any court of justice, respecting their individual claims, unless he dissipates or conceals his property in fraud of his creditors. See *Villadiego, page 53, No.* 166. *Febrero juicio de concurso, lib. 3 chap. 3, No.* 243.

Such is, may it please the court, the meaning, the full and only meaning of these few words: "Let the proceedings be homologated," which the judge on those occasions pronounces. These words are a solemn judgment of the court, by which the insolvent is condemned to pay his debts at the end of the delay by him asked of, and to him allowed by the majority of his creditors; and by which all the dissenting as well as the consenting creditors are estopped from exacting their claims until the expiration of said delay. See *Villadiego, page 53, No.* 170. That judgment of the court, may it please your honors, like every other judgment of a court of

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

justice, must be complied with, it must be executed and carried into effect.

If this is correct, and I am confident it is, then such a judgment existed against John Poultney at the time of his death.

What was then to be done? If he had continued to live, and had failed to fulfil that part of his obligations imposed upon him by the judgment, could he have prevented the necessary process, to compel him to do it, from issuing? Certainly not. *Pasado el término de la espera puede ser apremiado a pagar*, says *Villadiego, page 53, No. 167.* I shall be asked, perhaps, in what manner he could have been *apremiado a pagar.* The answer to this is far from being a difficult one. I say, that several modes of carrying the judgment against him into effect, existed.

In the first place, the *deliberations* before the notary, as we call them, are nothing but what the French call a *concordat* and the Spaniards a *convenio*, sanctioned by the judge, by which the debtor binds himself to pay his creditors what he owes them at the end of a stated period; and which binds him and his property: To show that such *concordat, convenio*, is a contract that binds him, no authority I hope will be required to be referred to; and reason, common sense and law, unite in telling us that it binds his property. When an insolvent debtor applies to a court of justice for a respite, he annexes to his petition a schedule or *bilan* of his debts, assets and property. Both the petition and *bilan* are sent before a notary, at whose office the court orders the creditors to meet together on a certain day. There the debtor or his attorney, appears before the creditors; and after stating to them the causes which have produced his embarrassments, to acquaint them with his resources, he tells them: Look at my schedule; it shows what I owe; and, also, the debts due to me, and the property which I possess. With those debts, when collected, I shall pay you. If not collected, or insufficient, my property will be there to answer for your claims. The creditors, upon this, grant the respite, or a portion of them refuse it; if a majority only grant it, recourse is had, as I

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

already said to the court, to compel the minority to abide by the will of the majority. See *Villadiego ut supra, No.* 170. From the moment that the court has *homologated* the respite, the insolvent has no right to dispose of any of his means, or to pay any one of his creditors to the prejudice of, or in preference to the others. If he does it, an action called *revocatoria,* lies in favor of the mass of the creditors to have the whole annulled; and upon this action, things are replaced on their former footing. See *Curia Philippica, verbo revocatoria, No.* 25. It is from this, may it please the court, that I say, that reason, common sense and law, unite in telling us that the *concordat, convenio,* or contract, between the insolvent and his creditors, binds and affects his property. Is it not obvious to your minds, as it is to mine, that if it was not for the kind of security which the creditors find in the property described in the *bilan,* they would not grant the respite? Is it not the promise thus made to them, either tacitly or expressly, by the insolvent, to pay them out of his property, which induces them to grant the respite? Does not the petition and *bilan* make part of the act by which the respite is granted? Then, I say, that this notarial act has all the characteristics, unites all the requisite circumstances which constitute that description of obligations, which by our Code of Practice carries *apare jada execucion;* that is to say, upon which an order of seizure and sale issues immediately.

This then, I contend, is one of the modes which the mass of the creditors have, in order to carry into execution the judgment of the court, by which the *concordate,* the *deliberations* have been homologated.

Now, as to the second mode, I have no doubt in my mind that it may be resorted to also: for, if what we call the *homologation* of the concordate or deliberations, is, as I am confident it is, a judgment of the court, by which the debtor is bound to pay his creditors, at the expiration of the time which they are obliged to suffer to elapse before they can claim any thing, I ask what can prevent a *fieri facias* from issuing for the benefit of the mass of the creditors, as soon as that time is passed. May it please your honors, the

49

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

judgment of homologation in such case, is nothing more nor less than a judgment entered by consent, on the part of the debtor, with a stay of execution until a fixed period of time.

Could John Poultney, if he had lived, have prevented either the one or the other of these two modes of forcing him to pay his debts, from being resorted to, if he had not paid his creditors at the end of the first instalment? Could he have stopped them by any legal formality? No, not even by tendering a cession of his property; for he who has already had the benefit of a respite, cannot afterwards be admitted to the benefit of the *cessio bonorum*: he must pay his debts or go to jail. So says *Villadiego, page 53, No. 167.*

There remained nothing unsettled between the insolvent and his creditors. His debts to all and each of them were ascertained and proven in the most unequivocal manner, by his own oath at the foot of his *bilan*. No new suit or action, therefore, was necessary to be resorted to; all that was to be done was to carry the judgment of homologation into effect; and I say, without fear of contradiction, that the District Court, who had rendered that judgment, was the only one that could be applied to in order to enforce it.

Could those persons, called by law to be his heirs, have any more right than he had himself? Could their situation be different from his own? I say, may it please your honors, that, unless they, at once, came forward and accepted his succession purely and simply, and made, not only his estate, but their own persons and property, liable for the whole amount of his debts; they could not even avail themselves of the respite granted to him by his creditors, although that *respite* had been homologated (approved) by the court. So says Febrero, who has almost constantly been our only and safest guide in these matters. Let me be permitted to quote here his very words: " *No aprovecha*, says he, *la moratoria á los herederos del deudor, que estando pendiente, fallecio, si aceptan su herencia con beneficio de inventario, aunque el juez la haya aprovado; y la razon es, porque como por esta aceptacion es visto no querer obligarse ultra vires hœreditarias, no hay materia sobre que recaiga; y así pueden los acreedores proceder contra*

EASTERN DIST.
· June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

*la herencia, sin aguardar á que espire el término concedido.*" See
book 3, chapter 3, section 2, *No.* 243 *(de consurso.)*

Had the present plaintiffs accepted the succession of their
father John Poultney, purely and simply, at the time that an
application was made by his creditors to have syndics
appointed in order to administer his estate *for the benefit of all
concerned?* No, nor could they accept it in that manner;
for they were minors, and the law most expressly forbade
tutors or curators of minors to accept any succession for them
otherwise than *con beneficio de inventario.*

I believe, may it please the court, that I have shown
satisfactorily, *first,* that the District Court had concurrent
jurisdiction with the Court of Probates, of actions against a
succession for the payment of debts due by it. *Second,* that
the cause of the *concurso* was, in a great, measure, still
pending before the District Court at the time of Poultney's
death. *Third,* that the judgment of homologation, rendered
by that court, was nothing more nor less than a judgment
entered by consent of the debtor, with a stay of execution.
*Fourth,* that, after the delay, execution must issue: that is
to say, the judgment must be carried into effect. *Fifth,* that
the court who rendered this judgment was the only one
which could be applied to by the creditors to have it enforced.
*Sixth,* that the plaintiffs in this case could not claim the
benefit of the respite. *Seventh,* that they could not, therefore,
prevent, by any legal proceedings, the creditors from having
their judgment carried into effect against the succession of
their deceased father. Enough, then, on the question of
jurisdiction.

But the plaintiffs' counsel have contended that the passage
just quoted by me from Febrero, applies only to the cases
when the respite was granted by the king, which is, they
say, called *moratoria;* and that it does not apply to those
cases (such as ours,) where the respite is granted by the
creditors themselves, which is, properly speaking, the *espera:*
that the former does not avail the heirs, because it is an act
of power, done without the consent or participation of the
creditors, and must, therefore, be personal; whilst the latter

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

is granted by the free will of the creditors themselves, and is, therefore, like every other contract, to inure to the benefit not only of the debtor, but of his-succession also.

This, may it-please the court, is all founded in error. In the first place, *moratoria* is a generic term, and so is *espera;* both are synonymous, and used indifferently to signify that delay which we call *respite,* whether it be granted by the king or by the creditors. In the next place, a *respite,* or *moratoria,* or *espera,* in which the sanction of judicial proceedings is required, is never a voluntary act on the part of all the creditors. It is *voluntary* on the part of the consenting majority alone: it is *forced*—always forced, as it respects the dissenting minority. It is because of the refusal of some, that recourse is had to courts of justice. Where would be the necessity of any such recourse, if all the creditors were willing to grant the *espera,* the *moratoria,* the *respite*—call it as you will? Is it required to refer the court to any authority to support this plainest of all propositions? Then look at *Villadiego,* page 53, *No.* 165; look at *Febrero,* [*concurso*] book 3, *chap.* 3, *sec.* 3, *Nos.* 238, 242; look at the *Curia Philippica, verbo esperas, No.* 3; look at the 5th *Partida, law* 5, *title* 15.

I beg leave to say here, that I was very much surprised, indeed, when I heard it contended—seriously contended, that *moratoria* was the delay granted by the authority of the king, and *espera,* the delay conceded by the creditors themselves. I never did apprehend that gentlemen, well versed in the Spanish language, and in the knowledge of Spanish law terms, would ever advance such an erroneous proposition.

Let us turn to the authorities just referred to ; we shall see that the Curia Philippica, under the head of *Esperas,* says, No. 1 : " *Aunque no vale el rescripto del príncipe, en que remite la deuda al deudor, empero vale el en que le concede espera.*" The same book says, No. 2 : " *No teniendo el deudor bienes suficientes para la paga de sus deudas, antes de hacer cession de bienes, y no despues puede pedir, á sus acreedores esperas por un plazo señalado.*" No. 3 : " *Si todos los acreedores, no se conformaren en uno en conceder la espera vale en concediendola la mayor*

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

*parte; en los quales casos los que no conceden la espera estan obligados á pasar por lo que hicieren los que la conceden,"* etc.

Here we see but one word, the word *espera,* used by this most respectable book, to express both the delay granted by the authority of the prince, and the one conceded by the creditors.

Villadiego, page 53, No. 165, 166, 167, 169, 170, uses also the word *espera* and no other, to signify both the delay asked and obtained from the king, and that demanded of and conceded by the creditors.

Febrero on the contrary, almost always makes use of the word *moratoria,* to express both these *delays* or respites.

In his No. 232, *loco citato,* he says : ." *De los quatro generos de concursos propuestos en el No. 1, de este capitulo, el tercero en el orden es el de espera ó moratoria, que el deudor pide al rey ó á su consejo en su nombre, ó á sus acreedores.* In his No. 237, he says: *"Está destituido de potestad y facultades el consejo de hacienda para conceder esperas ó moratorias."*

In speaking of the *delays* granted by the king or in his name, he calls them *moratorias de gracia.* See No. 234.

In speaking of that conceded by the creditors, No. 238: *" La otra clase de moratorias es quando los acreedores á deprecacion del deudor le conceden algun tiempo, á fin de que en su intermedio proporcione el pagamento de lo que les debe ; y ésta se llama vulgarmente espera de acreedores."*

So we see, that *legalmente,* legally speaking *moratoria,* according to this writer, is the term by which are signified both the delay obtained from the king, and the delay obtained from the creditors.

Shall we consult the dictionary of the Spanish Academy ? We shall read : " *Mora (substantivo femenino forense) dilacion otardanza—Moratoria—s. f. espera concedida por el rey,* etc., which has evidently for its root the word *mora.*

Perhaps all the law writers above referred to, and the Academy itself are mistaken : it may be that the gentlemen on the other side understand Spanish better than they do. Then let us see how the lawgiver himself speaks it ; I believe we may be safe in using his own expressions.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

In the 15th law, title 5th, book 2d. of the Recopilacion de Castilla, the king says: *Ordenamos, y defendemos que los oidores, no den ni libren á persona alguna, cartas de espera de sus deudas, &c.*

In the Autos Acordados, book 2d., title 4, Auto 79, the lawgiver says: "*Luego que se pida moratoria por qualquiera interesado mandará el consejo, &c.*

Let us then boldly repeat, that *espera* and *moratoria* are synonymous terms, which both signify a *respite granted either by the king or by creditors to a debtor who finds himself unable to pay his debts.*

Indeed, I cannot conceive how that could be for a moment disputed or even doubted. Did not the gentlemen, and does not the court see, that the passage of Febrero which treats of the effects of the *moratoria*, as it respects the heirs of the insolvent, cannot possibly bear the construction which was on the part of the plaintiffs, attempted to be put upon it? Let us read it again. It says: "*No aprovecha la moratoria á los herederos del deudor, que estando pendiente falleció, si aceptan su herencia con beneficio de inventario, aunque el juez la haya aprovado ; y la razon es porque como por esta aceptacion es visto no querer obligarse ultra vires hœreditarias, no hay materia sobre que recaiga ; y así pueden los acreedores proceder contra la herencia sin aguardar á que espire el término concedido !*"

Before saying that this applies only to the *moratoria* granted by the king, would it not be absolutely necessary to show that such a *moratoria* needed, after being granted, the approbation of a judge? Where is the man, in his right senses, that will feel disposed to say that it did? We might as well say that the power of the king of Spain was inferior to that of a judge, or subordinate to it in those matters. Did not the gentlemen see, and does not [the court know that, in Spain, the *moratoria* could be obtained in two ways? The one by applying to the king, the other by applying to the creditors. In the first case, do we find in any writer, or in the laws which treat of the power of the king to grant *moratorias*, that, in order that they may be carried into effect,

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECILS EX'R.

they must be approved by the judge ? Certainly not. Such approbation is necessary only in case of a *moratoria* asked of the creditors, when some of the latter refuse, and the majority are willing to grant it. Then and then only, recourse is had to the judge, to have the minority compelled to abide by the will of the majority. So say all the law writers ; and nothing to the contrary can be shown.

But it is said that the *heirs* of John Poultney ought to have been cited, when the application was made by three of the creditors, to have a meeting of them all for the purpose of appointing syndics.

May it please your honors, there is no more foundation in law for that proposition, than for all those which I have already had under consideration.

In the first place, there were indeed persons called by law to take, as heirs, the estate of the insolvent, after his death, to wit : his children. But they never were his heirs, until after the incipiency of the present suit, to wit : in March, 1833 ; at which time his succession was accepted for them, as minors, under the benefit of inventory.

But up to the latter period, that succession was vacant ; for nobody presented himself to take possession of it, either as heir or under any other title. *Old Civil Code*, 172, *article 118.*

In the next place, the same code, 160, article 71, says : " Nobody can be compelled to accept a succession, and may, therefore, accept or repudiate it." Hence, it results that no man can be said to be the heir of another, as long as he has not, by his acceptance, declared that he is.

In the third place, the children of John Poultney, who died insolvent, had no interest whatever in the settlement of his succession : that is to say, in admitting that they were *his heirs* without having accepted his succession, they could receive nothing from it, until after the payment of his debts ; and, as to those debts, they were already liquidated by his sworn *bilan,* and by the judgment of homologation of the respite he had obtained. In what capacity, therefore, could they have been cited ? and for what object ? The propor-

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

sition contended for by their counsel, is evidently founded upon the wrong supposition, that as soon as a man dies, those that are by law called to inherit, are at once vested with all his rights and titles, and also bound to discharge all his obligations, and do in every respect, represent him. Such was and such is, may be, at present, the law of France; but such never was the law here, before, not at the time of the death of John Poultney. On the contrary, until accepted or claimed, a succession remains vacant, as we have just seen; and until accepted or repudiated, the same is considered as a fictitious being, representing, in every respect the deceased. So says the *old Code*, 162, *article* 74.

These principles are not new. They are as old as the Roman law. See *Justinian's Institutes, lib.* 2, *tit.* 14, 32, and *Salgado Laberint. Cred., part* 1, *chap.* 32, *page* 219, *No.* 3.

Besides, the children of John Poultney were minors, and the law did not permit them, or their tutors or curators, to accept a succession otherwise than under he benefit of inventory. See *old Code*, 163, *articles* 80 — *and* 71, *articles* 62 *and* 63.

I contend, therefore, that it would have been most irregular and useless to have had those children served with any citation. Let us recollect that Febrero tells us, that the *respite is of no avail to the heirs of the debtor, who dies during* its pendency, if they accept his succession under the benefit of inventory; and that the creditors may at once proceed against the succession, without waiting for the expiration of the said respite. What is the plain meaning of this? Is it not that the *heirs* do not represent the deceased unless they accept the succession purely and simply, and thereby render themselves and their own property liable for the payment of all his debts? Is not the plain meaning of this, that the heir who accepts under the benefit of inventory, remains, when the respite obtained by the deceased is still pending, a total stranger to the succession? Yes, may it please the court, the heirs, in such case, under such circumstances, are beings totally distinct from the deceased and his succession. The contrary cannot be admitted or sanctioned without violating our clearest laws.

The children of John Poultney, therefore, could not be sued; and if they could not be sued, they could not be cited.

The estate, the succession of the deceased, a fictitious being, it is true, but a being in the eye of the law, and by the will of the law, was the only *person* that could be sued; and the creditors had a right to sue it.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

Now, may it please the court, what did the creditors do? I have shown, I believe satisfactorily, that they might have had at once, an execution issued, or an order of seizure and sale, to have the property left by the deceased, sold to satisfy their claims, which were liquidated by both the *bilan*, sworn to by their debtor, and the judgment of homologation of the respite.

In order to attain this end, three of them, acting most evidently for the interest of all, have presented a petition, stating the insolvency and death of John Poultney, and the renunciation of his widow to his community, and praying that a meeting of all the creditors be ordered, for the purpose of appointing syndics to administer the estate for *the interest of all concerned.*

This mode of proceeding is, as the court knows, a kind of *concurso de acreedores*, which is properly called *ocurencia*, ó *pleito de acreedores.* It may take place, *first*, when the property of a debtor is seized by some of his creditors, and the others intervene and pretend to be paid in preference. *Second*, when the debtor is dead, and creditors present themselves before the court in which his succession is opened, in order to have their claims satisfied. *Third*, when creditors proceed against the property of their debtor, in consequence of his having fled, or of his being insolvent. This proceeding is also called *concurso necesario*, and is had *con total independencia del deudor;* that is to say, without making the debtor a party to it. So says *Febrero, de concurso*, book 3, chap. 3, sec. 2, *No.* 39.

But, say the plaintiffs' counsel, "John Poultney did not die insolvent. His schedule upon which he obtained the respite, showed that his assets and property amounted to more than his debts."

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

Yes, his schedule showed all that.  But why did it show it?  Because he had thought proper to enhance as much as possible the value of his property, in order to inspire in his creditors some more confidence than they might otherwise have had, in his means to satisfy them, had he put his assets and property down to their real worth or value.  Such an argument is entitled, in my opinion, to very little weight, particularly when we see that it is the daily practice of *gentlemen,* who are (God knows from what cause) real bankrupts, to present to their creditors *bilans,* which make them appear perfectly solvent

What better evidence could we wish to have of the total insolvency of John Poultney, than the renunciation of his community on the part of his widow, one of the plaintiffs, shortly after his death?  That renunciation is here on record.  Such an act, may it please the court, never takes place when a married man dies rich.  It is never made except in cases of undoubted insolvency ; for its only object is to rid the widow from the obligation of paying the debts of the married couple, and to enable her to take back, out of the mass of the community, and free from all charges, what she had brought into the marriage.  Indeed, the assertion that John Poultney did not die insolvent, comes with but very little grace out of the mouth of his surviving lady, after such a renunciation.

Again, may it please the court, was not John Poultney an insolvent debtor in the eye of the law, when he called for a respite?  See *Civil Code,* 439, *article* 1.  *Curia Philippica, verbo falidos, No.* 1 *and* 3.  No lawyer is permitted, legally speaking, to call him otherwise than *insolvent debtor.*

Let us say, if we wish to show ourselves friends to truth, that, unfortunately for himself and family, and for his creditors, John Poultney, junior, was insolvent—perfectly insolvent when he departed this life, to go and present his general *schedule* before the throne of the Almighty.

Then, I say, that the proceedings of the *ocurencia* were justly and properly resorted to; and that nobody has any right to object to the want of citation to the children of the

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

deceased; for, if he had been alive and had not satisfied his creditors, after the expiration of the first instalment fixed by the respite, those proceedings would have, most legally, taken place against his property, *"con total independencia suya,"* without making him a party to them.

The plaintiffs' counsel refer us to Salgado, to show the necessity of citation to the heirs, when proceedings are intended to be instituted against a succession which has not been accepted.

I know, may it please the court, that Salgado says: *"creditor qui cum hæreditate contendere vult, qualitate et conditione ejus perquirere et indagare tenetur, ne judicium reddatur illusorium et irritum:* I know that he says also, that when there is an heir instituted *iste nominatim et specialiter erit citandus;* but, for what purpose? *" erit citandus et requirendus,"* says he, *" pro declaratione an adeat vel repudiet hæreditatem intra terminum sibi a judice prefixum."* I know that this writer says, that when it is uncertain that there are heirs, either in consequence of the one instituted having renounced, or because the deceased made no will, and the legal heirs are unknown, they must be called upon by *proclama,* public advertisements; and that, if, after this is done, no one appears who accepts the succession, a curator is to be appointed to it.

Was all that necessary? Most undoubtedly, my client is not, and cannot be made to bear the blame; he cannot, and ought not to suffer if it was not all done. He was not a party to those proceedings of the *ocurencia,* nor was he employed by the petitioner as counsel to institute them.

If all that was absolutely necessary, why was it not done? My friend, Mr. Grymes, who is now one of the plaintiffs' counsel, and who was then one of the attorneys who signed the petition for the *ocurencia,* is, I suppose, better able than any of us here, to inform us of the reason why all that was not done.

I am sure that he will, with his ordinary candor, tell us that he does not know it very well himself. The fact is, may it please your honors, that at the time these proceedings

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

were had, Salgado's works were but very little known, if they were to be found (which I sincerely doubt myself,) on the banks of the majestic Mississippi.

But I will add, that, had Salgado's most valuable works been better known and better understood, no better or more legal proceedings could have been had than those of the *ocurencia*, such as we have them. Why?

Because it was entirely unnecessary to cause minor children to appear and declare, by themselves or their tutors, whether they would accept or repudiate the succession of their fathers, when the law tells us, that they cannot accept otherwise than under the benefit of inventory; and when the law tells us also, that the heirs who accept under the benefit of inventory the succession of a debtor who dies during the pendency of a respite, cannot avail themselves of the benefit of it, and that the creditor may at once proceed against the *succession (la herencia)* without waiting until the expiration of the *espera, moratoria,* respite.

But, it is said, "the old Code said, that previous to proceeding against or suing a vacant estate, a curator is to be appointed to it. So says the Code, and I say, that this requisite has been complied with.

The petition for the *ocurencia,* may it please the court, was not a proceeding against the succession. No remedy is asked against it. The only object of the prayer of the petitioners is, that the creditors be called together, to appoint syndics to administer *for the interest of all concerned.* Now, what is the difference between syndics and curators? There is none. Febrero tells us, that the *administrador* of a *concurso* (whom we have been pleased to call a syndic) is the same as a curator *ad bona,* and that his powers and faculties are, in every respect, the same; and Salgado, page 221, No. 46, tells us, that procurators', syndics' and administrators' acts, are binding against the succession which they represent; thus showing, that no difference exists between a *syndic* and a *curator,* except as to the name.

"But," say the plaintiffs, "the judge was to appoint the syndic or curator"; no doubt; has not the judge appointed,

or done what is tantamount to his having appointed the syndics in our case? Certainly; for he has sanctioned their appointment upon the return made into court of the deliberation of the creditors; and, upon the filing of a petition or upon a motion, on their part made and signed by my friend Mr. Grymes; he has also, ordered them to be put in possession of all the property belonging to the deceased insolvent, and to sell the same according to law.

So we see, that before any step is taken against the estate, curators are appointed to administer it for *the interest of all concerned*; and that when they are appointed and confirmed, they are put in possession of the estate and authorised to sell it.

Then I say, that every thing which both the Code and Salgado required, has been punctually and faithfully done; and I conclude, that the succession of John Poultney has, by the taking of possession, and by the sale of the land in controversy, been divested, legally divested of that property; and that the plaintiffs, who are bold enough to come after so many years, and claim it in consequence of their but very recent acceptance under the benefit of inventory, have and can have no right to any particles thereof.

But, say the plaintiffs' counsel, the return of the sheriff's sale to George M. Ogden, dated June 13th, 1820, was not made until the 18th June, 1823!

What have we to do with the sheriff's return? Was that return necessary for the validity of the sale? Most undoubtedly not.

But it is objected, that the sheriff's deed of sale to the said Ogden, says, "that he sold all the *rights* and *title* of John Poultney, and makes no mention of the *rights* and *title* of his *children!*"

Certainly, and what could that bill of sale say more consistent with law and truth? Had the children any title or rights in or to the property sold? None that I know; none that can be shown. They had not chosen to accept, in any manner whatever, the succession of their father. They were not his heirs; they were not vested with any

Eastern Dist.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

right or title whatever, respecting any part of his estate: the sheriff, therefore, did not sell or transfer by his deed any thing of their own ; and could not, of course, speak in that deed, of things which he did not sell or convey.

Let me be permitted to repeat, that nothing but a positive and pure and simple acceptance on the part of the children, could make them heirs of their father, so as to vest them with all his rights, titles and property.    See *old Code*, 161, *article* 71.    1*st Febrero Juicios*, *No.* 109, 110 *and* 111 ; and no such acceptance was ever made by order of the plaintiffs.

Before concluding upon this question, I beg leave to offer a few remarks upon an error which, it seems to me, is the most striking of all those that the gentlemen on the other side have fallen into ; and it is this :

As I stated before, and as they show it themselves in their own statement of facts, their clients never accepted the succession, except under the benefit of inventory.    They evidently believed, and do still believe, that such an acceptance transferred to them all the property of the deceased, since they, in consequence of it, claim it, and make all their best efforts to sustain their *petitory action* to recover it.    I think, may it please the court, that in this the gentlemen are totally mistaken.    If such an acceptance could make the acceptor proprietor of the estate, ought it not to make him liable for all the debts due by the estate ?    Most undoubtedly. And would an action, from any of the creditors of the deceased, now lie, after such an acceptance, against his children personally ?    Certainly not.    The court would say, at once, read the old as well as the new Code of Louisiana ; read the Spanish laws from which their provisions on this subject have been borrowed, and you will see that they are not liable personally :  by accepting in this manner, they have told you and all the world, that they did not make themselves liable " *ultra vires hœreditarias.*"

If this is correct, as I am convinced *it is*, I say, may it please the court, that the law did not give the plaintiffs in this case, the right to claim as they do, in their petition, the property in dispute, as their own.    Look at our codes ; they

EASTERN DIST.
*June*, 1835.

POULTNEY'S
HEIRS·
*vs.* ·
CECIL'S EX'R.

will show you that the only right or power which they confer to, and are acquired by, the heir who accepts under the benefit of inventory, is to administer the succession. He is not, with respect to creditors, legatees, or any persons, the true heir of the deceased, nor the true proprietor of his estate. Nor can he dispose as he pleases of any part of the property; he is a mere administrator, who cannot sell even moveable things without the authorisation of the competent judge ; he is bound to furnish security, if required, to answer for his administration, and all the obligations imposed upon mandataries are imposed upon him.

Then, I say, may it please the court, that the plaintiffs had no right to bring an action of revendication in their own name ; no right to claim the property as belonging to themselves. If the property claimed had been wrongfully alienated, if the succcession of their father had been illegally divested of it, it continued to belong to, and could only be claimed in the name and for the benefit of that succession. Upon this, therefore, I contend ; yes, I contend that upon this alone, the plaintiffs ought to be turned out of court.

Let us pass to the examination of our second question, to wit: are the proceedings in the District Court, and the order of seizure and sale granted against the syndics, on the executory or hypothecary action of George M. Ogden, Peter V. Ogden and Charles Harrod, and in consequence of which, the property in dispute was sold, good and valid in law?

As to the jurisdiction, I have, I believe, already shown that it existed in the District Court: I will, however, add a few words on this subject here. The property subject to the action in that case, was then in the hands of syndics, appointed or confirmed by that court, and subject to the orders and directions of that court, alone. Therefore, no proceedings could take place, either against the property itself, or against the syndics or mass of creditors, in any other tribunal.

"But," say the plaintiffs: "no order of seizure and sale could issue until the act importing confession of judgment

EASTERN DIST.
June, 1835

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

had been declared executory against his heirs;" and, in support of that, they refer us to the *old Civil Code, page* 200, *article* 229; and, *page* 490, *article* 7.

These articles say: "The creditors cannot obtain any execution against the person or estate of the heir, by virtue of a judgment rendered in their favor against the deceased; nor by virtue of any title importing confession of judgment, until they have caused such judgment or title to be declared executory against the heir, which shall be effected by means of the ordinary civil action."

"No seizure can be made on a widow in community, or on the heir, until after having caused to be declared executory against them, the title executed by the deceased or the husband."

May it please your honors, it appears to me that the adverse counsel did not very distinctly understand the law which they took the trouble of referring us to; or, if they did, they must have constantly been laboring under that palpable error which I think I have already rendered so clear, to wit : that the persons who are by law called to be the heirs of a deceased, succeed at once and without any formality to all his rights, titles and property, and are in the same manner vested with every thing that belonged to him before and at his death. Have I not shown that the acceptance of a succession is absolutely necessary to make an heir? Have I not shown that until a pure and simple acceptance there is no heir?

And now, in point of fact, was there any order of seizure or execution obtained, issued or carried into effect, against either the *persons* or *estate* of the *heirs*?

Let the plaintiffs show us : 1st. That without any *acceptance* on their part they were *heirs*; 2d. That their *own* property has been the object of the order of seizure and sale in question. Then, this ground of theirs will be supported by the laws which they quote; but, they cannot show any one of these two things; their ground, therefore, is untenable.

The order of seizure was not directed against any property belonging to the plaintiffs. It was directed against property

belonging to the *vacant* succession of their father, which,
until accepted was a fictitious being, representing him in
every respect, and was defended by syndics who were
appointed and confirmed to administer for the interest of all
concerned; and I contend, that so far these proceedings were
perfectly correct.

But, it is contended in the next place, "that the order of
seizure and sale issued irregularly, because the parties
applying for it, did at the same time, pray for citation and
judgment against the syndics, which was an abandonment"
of the *via executiva.*"

Unless I am very strangely mistaken, there can be no
solidity in this new position. I wish to know where the law
is to be found, which says, that "if the executory action and
the ordinary one are brought at the same time, in the same
petition, the whole shall be null. Would the gentlemen
have the goodness to point out that law to me? No such law
exists, or ever existed in this country.

We are only referred to two decisions made by this honorable
court, in which exceptions having been taken to proceedings
of the same kind, it was ruled that both actions could not be
cumulated. This was I conceive perfectly correct, though
in my opinion the authorities relied upon by the court did
not very clearly bear them out.

The first of these authorities was the *Curia Philippica, via
executiva, Nos.* 1 *and* 2; *and* 3d *Febrero Juicios, Nos.* 72,
113 *and* 115.

I beg leave to read them, and state my reasons for saying
that neither the one nor the other did clearly support the
decisions of the court.

The Curia Philippica, No. 1, says: "*Via executiva* is the
way by which we come to the execution and accomplish-
ment of the titles and instruments, which import confession
of judgment. It is of its nature brief and summary. It
was introduced in favor of the republic, and of the actor and
creditor."

It says, No. 2: "Hence it follows, that when a man has
that kind of action, if he uses it and sues also in the ordinary

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

way, he may discontinue this, and stick to the *executiva*, on paying to the defendant his costs; because both the *executiva* and the *ordinaria via* have been introduced in his favor, and though distinct, are not *contrary* to each other; and in using the one he does not abandon the other."

Febrero *citato* says, No. 133: "As to the question whether the *actor*, after having brought an ordinary action, may dismiss it and pass to the *via executiva*, the authors are divided for want of legal decision. Some say that he may, provided he pays the defendant's costs. But Carleval *de judic. tit. 3, disp.* 14, supposes two cases: the first, when the creditor who made his selection, having it in his power to use the *executiva*, abandons the *ordinaria*, and resorts to the *executiva*; in which case, Carleval, supported by upwards of thirty authors, and some texts of law which he quotes, says, that he cannot; and that the exception of *litis pendencia* will stop him, unless the debtor remains silent: because, in the first place having chosen the *via ordinaria*, when he could use the *executiva*, he is considered as having renounced this; and in the second place, it is not in his power to abandon the suit which he has commenced and is pending between him and his debtor, without his consent; because when there already is *litis contestatio*, it amounts to a *quasi contract*," &c. and I adhere to his opinion.

No. 115: "And if the creditor brings first the action *executiva*, and then passes to the *ordinaria*, he may discontinue this and go on with the first, on paying the costs occasioned to the defendant, by the proceedings on the *ordinaria*; and the reason is this: the two actions are distinct but not *contrary*. The *executiva* is introduced in his favor; by using the *ordinaria* he is not considered as having renounced the *executiva*, except when he does expressly say so, and no injury or prejudice results to the debtor, provided his costs are paid him."

I candidly confess that I cannot see in any of these quotations from the Curia Philippica and Febrero, how it would be permitted to decide as the court has done in the cases referred to by the plaintiffs: at the same time, I will

EASTERN DIST.
*June*, 1835.

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R.

say, that if I had the honor of a seat on this bench, I would also compel the *actor* to make his selection, if an exception was taken by the debtor to his cumulating both remedies in the same petition, and my reasons are these: when the executory process issues, the debtor may have the *execution* suspended, by filing, within ten days, certain *exceptions*, such as that of payment, fraud, simulation, usury, &c.; and when any of these exceptions is filed, there is *litis contestatio*, and the law requires that the proceedings should, from that time, follow the course of an action *ordinaria*, until final judgment.

If, then, the creditor, without waiting for any exception of those just mentioned, and in the same petition in which he takes the *via executiva*, and obtains his order of seizure and sale, proceeds, also, in the ordinary way by citation, &c., I would at once, upon an exception filed by the debtor, to that effect, tell the creditor, you have yourself, by proceeding as you have done, turned from the *executiva* to the *ordinaria*; the *executiva* must, of course, be suspended until the *ordinaria* is completely gone through, and a judgment rendered: but, surely, unless there was an *exception* to that effect, I never would feel authorised to throw any obstacle in his way. This, the court seems to have taken good care not to do; for, I see that in both the cases quoted by the plaintiffs, *exceptions* were filed by the debtors.

Be it as it may, after all, those two decisions do not support the plaintiffs in their new position; for, certainly it cannot possibly be inferred from either the one or the other, that when a man cumulates in the same petition, the executive and the ordinary actions, his proceedings are null and void: and one solemn decision, at least, in the absence of law, (admitting that this court may in that case or in any other, make laws for our government, which, I believe, no body will presume to say it may,) would have been necessary to justify the plaintiffs in taking that bold ground which I hope the court will say is far from being at all tenable.

Let us add here one single remark: those who were in possession of the property, against whom the order of seizure

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

and sale issued, and who were the only and real defendants who might therefore have, if they had thought it proper; taken any exception to that pretended irregular mode of proceedings, have not said a word; have made no objection at all.

Can the plaintiffs, who are strangers not only to those proceedings, but to the succession against which they were directed, can they I ask, come now and disturb what has been done by all the true parties to that executory action? I am persuaded the court will say with me, that they cannot.

But it has been objected " that Mrs. Poultney was never cited." Admitted; and what of that?

If her husband had been alive there would have been no necessity to serve him with a citation. *Curia Philippica, juicio executivo verbo mandato, No.* 7.

In the second place, she was not in possession.

In the third place, she had renounced the community.

Finally, her children whose natural tutrix she was, had not been made heirs by any acceptance and were total strangers therefore to the *succession,* which I repeat, was a fictitious person representing the deceased in every respect, and whose interests were defended by syndics duly appointed to *administer for the interest of all concerned.*

For what purpose then should she have been cited?

She could have no defence to make either in her own name or in the name of her children.

Suppose that she or her children were interested, I say, that as the debt claimed was proven by a notarial act, by the *bilan* of the deceased, and by judgment of homologation, no kind of defence, plea or exception, on her or their part could exist; and I say, that in such a case no citation was necessary. Look at the Curia Philippica, Febrero and Villadiego, and you will find that though it is a universal principle of law, that citation is necessary for the validity of proceedings in court, and that the want of citation vitiates the whole, yet, in a case like that under consideration the citation may be dispensed with. *Curia Philippica, juicio*

*Civil, verbo citacion, No.* 22 ; 3d *Febrero, juicios* 93, *No.* 149 ;

Another objection on the part of the present plaintiffs is,
that the sale ought not to have been made by the sheriff
upon the order of seizure, that it ought to have been made
by order of the syndics.

What of that again ?

The syndics, who defended the fictitious person representing in every respect the deceased, who were in possession, who had been authorised to sell according to law, might possibly have said to the actors : "We do not deny your claim ; we know it to be just ; but we shall ourselves cause the property, which is specially mortgaged to you, to be sold as the law requires ; and out of the proceeds we shall satisfy you." I have no doubt that this answer would have been held good by the court. But can it be said that, because those syndics who were the only proper defendants, would not or did not think proper to make such a defence, and instead of making it, consented, either tacitly or expressly that the property should be sold by the sheriff, on an order of the court, the sale made in that manner is null and void ? Surely, the plaintiffs' counsel cannot insist upon such a pretension as this.

We come now to the last point, which, in my opinion, is entitled to some consideration, and which is the second of the printed points of the plaintiffs, to wit :

" The acceptance of the inheritance by the heirs has a retroactive effect," &c.

In support of this, we are referred to the Civil Code, 160, articles 72 and 73, which says :

" The acceptance of the inheritance, has a retroactive effect, that is to say, the heir is thereby considered as if he had taken possession of the estate at the time when the succession was opened by the death of the person to whom he succeeds, whatever be the time that elapsed between such death and the acceptance ; from whence it follows, that the heir has a right to all the property which may have increased

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

the estate during that time, and that he is likewise bound to support all the charges which may have accrued."

"The acceptance of the heir has also this effect, that he becomes of right and without any authorisation of justice, seized of all the goods, rights and actions of the deceased, under the obligation of satisfying all the charges of the succession."

May it please your honors, I am inclined to think, that had the plaintiffs' counsel reflected somewhat more seriously, before printing their twenty-three points, they would have spared themselves the trouble of inserting this among them. They would certainly have seen, that the two articles which they have had the candor to quote in support of it, could not in any manner be made to apply to their own case. 1st, They are found under the head of, and apply exclusively to, *the acceptance pure and simple.* 2d, The plaintiffs never accepted in that short but dangerous manner; they were cautious enough to accept in the safest of all ways, that is, under the benefit of inventory.

The first manner of acceptance renders the acceptor *liable* for all the debts of the deceased. So say the two provisions of the code above transcribed.

The second does not make the acceptor liable *ultra vires hœreditarias.*

In the first case, the heir takes *all* but pays the debts, whether that *all* is sufficient or not; and he pays them out of his own money and property, of course, when the estate thus by him taken, is insufficient.

In the second case, he takes the estate, to pay the debts out of its proceeds. When they are paid, if a balance remains, it is his; but when there is none, he is not even rewarded for his trouble; for no commission or remuneration is allowed him for his administration. *Civil Code, page 164, articles* 96, 97. *Ibid., page* 170, *article* 116.

In the first instance he is the true proprietor.

In the second, he is a mere administrator, without salary.

To conclude, I shall take the liberty of referring the court to Salgado, who speaking of the retroactive effect of the

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

acceptance, says, page 221, No. 42: "*Ista fictio retroactiva non est in consideratione, quando vertitur prejudicium tertii, qui jus habebat quæsitum antea quam fictio locum haberet.*"

I believe, may it please the court, that I have succeeded in making good the defence which I had undertaken to make. I think I have succeeded in showing that the succession of John Poultney, jr., had, prior to the suit brought against my client, been legally divested of the property in dispute ; that the court, by the process of which the said succession has been thus divested, had full jurisdiction; that all the proceedings before it, have been regular; and I am satisfied that you will say with me, that the plaintiffs have no kind of title to the property now in the possession of my client; that judgment must, therefore, be rendered in his favor, against them.

As to the question of prescription, I shall say nothing. It was ably treated by my colleagues; but, I beg leave to tell you candidly, that, upon a strict examination of the law, and of the facts to which it applies, prescription does not exist in favor of my client. It is not, therefore, upon this ground; it is upon those that I have just discussed, and, I think, made irresistible, if not by my feeble arguments, at least by positive, clear law and authorities ; that I rely to hear it said, in consequence of your judgment: "The plaintiffs are gone."

*Grymes* and *Slidell,* for the plaintiffs, in reply.

This is not a vacant estate, as contended for by the counsel for the defendant. The heirs were present, known and represented ; and as the law *then* stood an estate was only declared to be vacant, the heirs of which were either unknown, or absent and unrepresented. *Civil Code, page* 172, *article* 120, 121. *Ibid., page* 158, *article* 57. 4 *Toullier, page* 318, *No.* 294.

2. The property of Poultney's estate vested in his children, who were his legitimate heirs from the moment of his decease, and by the mere operation of law. *Civil Code, article* 10, *page* 146. *Ibid.,* 60, 1, 2, 3, *page* 158. *Domat,*

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

lib. 5, 298, 308.   Partidas 6, title 6, law 13.   Heineccius Prelectionis, 2 vol., page 70.   7 Louisiana Reports, 222. Bedford vs. Urquhart, ante 234, 241.

3. A vacant succession represents the heir and not the ancestor.   Merlin's Rep. verbo heredité, No. 1, 23.   4 Toullier, pages 93, 95, Nos. 80, 83.   Vazeille traité des prescriptions, vol., 1, Nos. 72, 73, page 77.

4. If a curator be appointed to a vacant estate, without citing the heir, or without using due diligence to find him out so that he may be informed. of the proceedings, such appointment is null and void.   Salgado, page 221   Nos. 19, 20, 23, 24.

5. In this case, prescription does not run against the heirs as is contended for.   Uninterrupted possession animo domini under a title translative of property, is necessary to form the basis of the ten years' prescription and to acquire a complete title.   Civil Code, articles 38, 44, page 482.   Vazeille, vol. 1, page 30, Nos. 32, 69.   10 Martin, 291.

6. According to the statutes passed by the legislature and which were in force when this succession was opened, the property of an estate or of a vacant succession could only be sold by order of the judge of Probates, contradictorily with an attorney appointed to represent the absent heirs. See Session acts of 1817, page 186.

7. The respite granted to Poultney before his death, enured to the benefit of his heirs after his decease.   7 Febrero part 2, lib. 3, chap. 3. No. 232.   All the obligations of the ancestor are presumed to be heritable under our laws.   A person is deemed to have stipulated for himself, and his heirs and assigns, &c.   Civil Code, article 22, page 264.

8. In order to have availed themselves of the respite, the creditors should have had the judgment of homologation declared executory against Poultney's heirs after his death; because property which has ceased to be his, cannot be affected by a judgment to which the new owners are not made parties.   Legendre vs. M'Donough, 6 Martin, N. S., 513–14.

*Bullard, J.,* delivered the opinion of the court.

This cause, in connexion with others strongly analagous, involving a variety of difficult and embarrassing questions of law, on the solution of which, it is understood, depends a vast amount of property, has occupied for several weeks, the anxious and undivided attention of this court. Both parties come forward under circumstances of equity : on the part of the plaintiffs, they appeal to their tender age and legal incapacity, and invoke the protection of the laws as the guardian of their rights. The defendants, on the other hand, exhibit themselves as utter strangers to the original proceedings of which their adversaries complain, as possessors in good faith, by purchases fairly made for a valuable consideration, and long possession. They, in their turn, rely on the presumed sanctity of judicial proceedings, growing out of the alleged insolvency of the plaintiffs' ancestor, the renunciation by his widow, and the silence and acquiescence of all concerned, for a period of thirteen or fourteen years.

In this conflict of equitable considerations we are bound to examine the legal rights of the parties, according to the laws in force at the time these transactions took place, without regard to any change of laws or circumstances since that period, guided by the best lights within our reach ; and in this investigation we have been greatly aided by the very able and elaborate arguments of counsel on both sides.

The succession of John Poultney, junior, whose title to the property in controversy is not contested, was opened in 1819, and this suit was instituted by his minor heirs in December, 1832, who afterwards, and pending the suit, accepted his succession, with the benefit of inventory. The defendant denies the title of the plaintiffs, and sets up title in himself, under a sale from Charles Harrod and Francis B. Ogden. The vendors of the defendant being called in warranty, answer by a general denial.

A leading question argued at the bar, and which first calls for our consideration, relates to the true legal situation of Poultney's estate as vacant or not, and whether, according to the law then in force, his heirs were vested with the title

52

EASTERN DIST.
*June,* 1835.

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

and property immediately on his death; or whether up to the time this suit was instituted, or the estate was formally accepted in 1833, they must be regarded only as having the faculty to acquire the property by acceptance, while the succession must, in the meantime, be considered as vacant, and not represented by an heir at law. It is conceded that the maxim of the customary law of France, that the title and possession of the heir, are but the continued and prolonged title and possession of the ancestor, according to that fiction, which represents the ancestor at the moment of his decease, as investing his heir with all his rights, *le mort saisit le vif*, was not known in its full extent to the Roman law, nor adopted in Spain. But, it is contended that the succession of children who, at the death of their father, were under the paternal power, and were denominated *sui hæredes*, formed an exception to the general rule; and that, as relates to them, no acceptance or judicial recognition, or *additio hæreditatis* was required to invest them with a perfect title to the property left by the father. That, while other classes of heirs, by the Roman law, were considered as having acquired a right in the property composing the estate, only by acceptance or some act equivalent thereto, these forced or necessary heirs, on the contrary, were regarded as continuing the existence of the *pater familias*, both in property and possession; and that a succession so represented could not be considered as vacant or *hæreditas jacens*.

This necessary heirship, which involved as a consequence the obligation on the part of the heirs to pay even *ultra vires hereditarias*, all the debts and charges of the estate, does not appear to have been adopted as a part of the law of Spain. That such heirs, without even entering on the estate, were capable of transmitting, at their death, the inheritance to their heirs, is undoubted; but the right of abstaining from the succession, of repudiating it, and consequently of being exonerated from the actions of creditors before acceptance, or intermeddling, and finally that of accepting with the benefit of inventory, appears to us repugnant to those subtilities of the ancient Roman law. 1 *Gomez variæ Resolutiones, verbo Transmis, hæred. No.* 25 *et seq.*

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

The text of the 1st law, title 14 of the 6th *Partida*, which treats of the *entrega* does not recognise any distinction between ordinary heirs and those who were denominated *sui hæredes*. This *entrega* or delivery is defined by that law to be the corporal taking possession of the property composing the estate: "*apoderamiento corporal que recibe el heredero de los bienes de la herencia;*" and it is said to be attended with great advantage, for the heir gains thereby, at once, the mastery or ownership of the estate: "*ca, si dé otra guisa fiziessen avria el nome sin la pro.*"

Whatever difference of opinion may exist among commentators, as to the true construction and effect of this law of the Partidas, it appears to us that the provisions of the Code of 1808, were too plain and explicit to admit of the distinction here contended for. According to that code, no one could be compelled to accept a succession and to assume the quality of heir: having accepted, he might still renounce; and having renounced, he might, in some cases, still accept again. It may, therefore, be said, that the heir could not be compelled to renounce within the period limited for his acceptance. Until such acceptance or renunciation, the inheritance is considered as a fictitious being, representing, in every respect, the deceased, who was owner of the estate. The acceptance has, it is true, a retroactive effect, and the heir is considered as having possessed from the opening of the succession; but it is by acceptance he is considered as seized of the property. Before acceptance, his title is *in facultate*, but not vested, at least as to third persons. *Civil Code, page* 161 *et seq.* The widow having renounced the community, and no body claiming the estate as heir, or under any other title, it must be considered as a vacant estate, according to the definition given in *article* 118, *page* 172, although the heir was present.

Such is the view taken of the provisions of the Code, by this court, twenty years ago, in the case of Cresse *vs.* Marigny. "The principle is," says the court, "that, until acceptance or renunciation, the inheritance is considered as a fictitious being, representing, in every respect, the deceased.

According to the *Civil Code* of 1808, no one could be compelled to accept a succession and assume the quality of heir; and having accepted, might renounce, and even accept again in some instances. Until such acceptance and renunciation, the inheritance was a fictitious being, representing, in every respect, the deceased. Before acceptance, the title of the heir is not vested. So, where the widow renounced the community and no person claimed as heir for thirteen years, the estate was considered and held to be vacant. Civil Code of 1808, art. 118, p. 172.

Eastern Dist.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

In the meantime there is no heir, and we see no reason why the persons who have a right to refuse to be heirs, should be considered as such, before they make known their intentions." 4 *Martin*, 57.

If the mother and natural tutrix of the minor heirs of Poultney, had, with the advice of a family meeting, accepted the succession for them, soon after the death of their father, they would have been regarded, in relation to creditors, rather as administrators than as the true heirs and proprietors of the estate; they might have been required to give security for the administration: they would have been entitled, in their own right, as heirs only to the *residuum* after the payment of the debts and charges of the succession. ∼ *Civil Code, page* 168, *article* 104, *et seq.*

When, as in the case now before us, the acceptance takes place many years after the opening of the succession, after the property has been alienated by judicial authority, at the instance of creditors, and for the payment of debts which formed a charge on the estate, and upon the heirs, the retroactive operation of such an acceptance ought not to be considered as conferring on the heir such absolute property, in the effects composing the succession, as to enable him to maintain a petitory action, without any regard to the intermediate alienations. That such acceptance might suffice as evidence of title against a naked possessor, may be true; but, when the title set up by the possessor, rests on an alienation provoked by creditors, before acceptance, it cannot be regarded as a mere nullity: and the great difficulty and embarrassment in this case, have arisen in settling the principles of law, according to which the validity of the defendants' title ought to be tested.

*The rules and forms prescribed for the alienation of minors' property, as such, viz : that it can only be sold in pursuance of the advice of a family meeting, and for its appraised value, do not apply to property alienated by judicial authority, at the instance of creditors and for the payment of debts which formed a charge on the estate; because the sale of property in which minors were interested, for the payment of debts, has always formed an exception to the rule.*

Upon this subject, we think the following propositions may be laid down as fair and logical deductions from the principles of the Code just announced:

1. That the rules which apply to the alienation of minors' property, as such, to wit: that it should be sold in pursuance of the advice of a family meeting, and not for less than its appraised value, have no application to this case; because,

the sale of property in which minors are interested, for the payment of debts, has always formed an exception to the rule; and, because the minor heirs, at best, have but a residuary interest in the estate, which could be ascertained only by a full administration.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

2. That all those grounds of nullity in the proceedings, which assume and are founded upon the hypothesis, that the minor heirs were always, from the opening of the succession, and before acceptance, his representatives in relation to creditors, and as such, entitled to citations and notices, must be laid out of view as inapplicable. These minor heirs, without acceptance, must be considered (saving the right to accept at a future time) as strangers to the succession, and the succession itself as vacant, and not represented by an heir.

Minor heirs, without acceptance, must be considered as strangers to the succession, which is in itself vacant, and not represented by an heir; consequently, the heirs are not entitled to citations and notices in the proceedings by the creditors to sell and distribute the property in payment of the debts.

These principles may be said to be of a negative character, and to warn us what ought not to be our guide, rather than as furnishing the true legal test and standard, by which we are bound to estimate the pretensions of the parties to this controversy. Both parties have appealed to article 95, page 164, of the Code, and much reliance has been placed on the principles which it consecrates. It declares, that "so long as prescription of the right of accepting is not acquired against the heirs, who have renounced, they have the faculty still to accept the inheritance, if it has not been accepted by other heirs, save, however, the rights which may have been acquired by third persons, upon the property of the succession, either by prescription, or by lawful acts done with the administrator or curator of the vacant estate."

This article applies by its terms, to a case somewhat different from the one now before the court. It supposes a renunciation by the heir, and a subsequent acceptance by the same heir. Now, a renunciation is not presumed, and in a legal sense of the word, the plaintiffs cannot be said to have renounced the estate of their father. Their tutrix might, with the advice of a family meeting, have accepted, but then it could only have been with the benefit of inventory. The estate was rather left vacant than renounced, their tutrix having neglected to take any steps to preserve the

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.
rights of her children. Let us suppose she had accepted, and finding it afterwards for the advantage of her children to abandon the estate, what steps would she have been compelled to take by the law then in force? The 7th law of title 19, of the 6th Partida, provides for such a case. It declares, that "when a minor has been admitted as heir, if he considers it disadvantageous to retain the estate, he may pray the judge to authorise him to abandon it, although he may have entered upon it. But when this is to be done, it should be contradictorily with the creditors, that they may know for what cause he abandons; and the judge, if he considers it disadvantageous to the minors to retain the estate, may authorise him to abandon, and replace him in his former condition, first placing all the effects which belong to the estate in custody, (*recabdo.*)" We here see, that while the law is indulgent to minors, it is provident of the rights of creditors, and that they are entitled to notice, whenever the heir who has accepted, wishes to renounce,

*After the time for deliberation has elapsed, an alienation made fairly by competent judicial authority, and for the payment of debts due by the deceased, and more especially mortgaged debts on the property alienated, will conclude the heirs who accept afterwards, with the benefit of inventory.*
and that the property composing the estate, must be delivered into the custody of the law, and that in substance such an abandonment is a surrender of the estate, to be administered for the benefit of the creditors. Perhaps the heir who had never accepted, ought not to be placed in a worse condition, than one who having once accepted, renounces the estate, and comes in afterwards to accept a second time, which is the case provided for by the 95th article now under consideration; and we can see no good reason for considering his condition more favorable, nor can we perceive, why an alienation made fairly by competent judicial authority, and for the payment of debts due by the deceased, and more especially debts secured by mortgage on the property alienated, should not conclude the heirs who accept afterwards, with the benefit of inventory.

*It is a settled principle that the retroactive effect of an acceptance, which is in truth but a fiction, should not be so extended as to operate to the prejudice of the rights of third persons, previously acquired.*
We have high authority for assuming as a principle, that the retroactive effect of an acceptance, which is in truth but a fiction, should not be so extended, as to operate to the prejudice of. the rights of third persons, previously acquired. 1 *Salgado, part* 1, *chapter* 32, *Nos.* 40, 41, 42.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

If the plaintiffs, on their acceptance of the estate, instead of a petitory action, had instituted their action for restitution *in integrum*, their success would have depended on the proof of two facts : minority and lesion. In considering whether they had suffered lesion, regard must have been had exclusively to the state and condition of things, at the time the transactions complained of took place, without any reference to subsequent changes, wholly independent of the will, or acts of either party. It is, to say the least of it, extremely questionable whether the plaintiffs, by adopting a different form of action, can change the measure of their own rights, or those of their adversary.

With these general principles in view, we proceed to examine the condition of the succession of Poultney, at the time of his death, in relation to creditors, and the rights of creditors in relation to the property, and to the heirs at law.

We cannot doubt, from the evidence in the record, that John Poultney died insolvent, not only in a legal sense, but in the common acceptation of the word. A few months before his death, he had applied to the District Court, to call his creditors together, alleging his inability to meet his engagements, and had obtained a respite for one, two and three years, which was homologated by the court. He died before the first payment fell due, according to the terms of the respite. The respite was asked for and granted, on the express ground of his inability to pay his debts, and the suit brought by him against his creditors a species of *concurso*, for the purpose of obtaining a forced respite, constituted him a *falido* or insolvent, according to the doctrine of the *Curia Philippica, verbo falidos, Nos.* 1, 3.

After the respite was granted and sanctioned by the court, the debtor might have been compelled to pay at the terms fixed by the respite, and was no longer at liberty to make a voluntary surrender or *cessio bonorum*, and was without any other remedy : he might be compelled to give security, if it was proved that he concealed or dissipated his property, in fraud of his creditors. *Villadiego* 53, *No.* 166, 167.

Whether the same court, which homologated the agreement of a majority of the creditors, and had ordered a stay

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

of proceedings, was competent to enforce the agreement, by compelling the debtor to pay, without the necessity of instituting a new suit, we do not think it necessary to decide ; but it appears clear to us, that neither the debtor nor his representatives could afterwards contest the validity or amount of the debts set forth and admitted in his petition ; and that as to both, the judgment of the court homologating the agreement, would have the force of the thing adjudged.

But the debtor in this case died before the first payment fell due, according to the terms of the respite ; and the question has been much discussed, whether the legal representatives of Poultney could avail themselves of the delay granted by the creditors and sanctioned by judicial authority or whether the privilege was merely personal, and ceased on the death of the debtor. *Febrero* seems to distinguish between heirs pure and simple, and those who accept with the benefit of inventory. His words are, "*no aprovecha la moratoria á los herederos del deudor que estando pendiente fallecio, si aceptan su herencia con beneficio de inventario, aunque el juez la haya aprobado ; y la razon es, porque como por esta aceptacion es visto no querer obligarse* ultra vires hereditarias *no hay materia sobre que recayga, y asi pueden los acreedores proceder contra la herencia sin aguardar á que espire el término concedido.*"

It is contended by the counsel for the appellants, that the *moratoria* here spoken of, is the respite granted by the sovereign or his council, and not that which is more properly called the *espera*, founded on the consent of creditors in a *concurso*. To this objection it may be answered: *first*, that the two words *moratoria* and *espera* are used both in the texts of the Spanish law, and by the best commentators, as synonymous; differing only in their etymology and employed indiscriminately by *Febrero* himself. *Second*, that he speaks of the respite as not availing the beneficiary heir, although it had been approved by the judge, and therefore not intending to confine the principle to that kind of respite which flows from the royal prerogative, and which required no judicial sanction, but was, in fact, a mandate addressed

to the tribunals, commanding them not to molest the debtor for a specified period; and again, that the same author had previously said that the *moratoria* granted by the prince, is a mere personal privilege, and did not extend either to the sureties or successors of the debtor: but the reason given by the author renders it clear to our minds that he meant such a respite as the one granted to Poultney, by his creditors. The reason assigned is, in substance, that the heir who accepts with the benefit of inventory, does not accede to the obligation of his ancestor to pay the debts, but he engages to pay so far as the means of the estate may extend.     The condition upon which the respite was granted, to wit: that the debts should be paid at the stipulated periods, under pain of compulsory process, no longer exists, as between the creditors and the beneficiary heirs; and, therefore, the contract, if it be so considered, is no longer binding: but the authority of *Salgado* is explicit on this point.  1 *Salgado, part. 2, cap. 30, No. 71.*

We are, therefore, of opinion that the estate was insolvent; the debts all due and demandable, notwithstanding the respite; and that the succession was not represented by an heir; and the question now arises, what remedy was left to the creditors; what proceedings did the law authorise them to take, and before what tribunal could they proceed?

The widow, shortly after the death of Poultney, caused the seals to be affixed on the effects of the estate, proceeded under the authority of the Court of Probates to have an inventory taken; and, finally, on the 25th of January, 1820, by a formal declaration before a notary public, renounced the community of acquests and gains.   In this state of things, on the 10th of February, 1820, some of the creditors, who were parties to the respite, applied by petition to the same court, that of the First Judicial District, representing the insolvency of the succession, the renunciation of the widow, and that the estate was unrepresented, and prayed a meeting of the creditors for the purpose of taking into consideration the affairs of the succession, and of naming syndics to administer the same for the benefit of all concerned.   A

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

Where a respite has been granted to a debtor by his creditors, and he dies before the first instalment becomes due, according to the terms of the respite, his estate will be considered insolvent, and the debts all due and demandable, notwithstanding the respite, if the estate is accepted with the benefit of inventory.

53

Eastern Dist.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

meeting of the creditors was thereon ordered. The creditors met and appointed syndics, whose appointment was confirmed by the court, and they were authorised to take possession of the estate, and to sell the property. The petition presented by the syndics for that purpose, represents that they had been appointed, and that more than ten days had elapsed since the filing of the proceedings, and no opposition had been made. This order of the court bears date April 4, 1820.

On the 23d of March preceding, the same syndics presented their petition to the judge of the Court of Probates, in which they set forth that the widow Poultney having renounced the community, a meeting of the creditors of the deceased had been had, under the authority of the District Court, and that they had been appointed syndics; they therefore pray that the seals of the Probate Court may be taken from the papers, effects, &c., of the deceased, and the same delivered to them to be administered according to law; wherefore the court gave the following order: "Let A. Peychaud, Esq., justice of the Peace, be authorised to take off the seals affixed upon the papers and effects left by said deceased, as prayed for."

Did the syndics thus appointed legally represent the vacant succession of John Poultney; and if so, were the proceedings had contradictorily with them, which terminated in the alienation of the property in controversy, binding on the heirs, who subsequently accepted his succession, according to a just construction of that article of the Code, above commented on, which recognises the validity of acts done with the administrator or curator of the vacant estate ?

The counsel for the appellants in their 4th point, contend that no forced surrender could be had of the estate of a deceased person, on the suggestion of its insolvency. It could only be administered by the Court of Probates. The first case relied on, that of Dupuy vs. Griffin, differs essentially from this. In that case the estate had been in a train of administration, by a testamentary executor acting under the authority of the Court of Probates, and this court decided, that the creditors could not compel the surrender of it to be

administered by syndics.  In the case of Jenkins *vs.* Tyler, Eastern Dist.
the only question was, whether an order of seizure issued ___June, 1835.___
against mortgaged property, could be prosecuted after the    POULTNEY'S
death of the defendant, who died after the seizure.  But the    HEIRS
question now presented is, not whether by the law existing    CECIL'S EX'R.
at that time, the representatives of an insolvent estate could
be compelled to surrender it into other hands, to be adminis-
tered for the benefit of creditors, but whether syndics or other
representatives could be validly appointed to represent the
succession of Poultney, *not otherwise represented,* at the
instance of creditors, with a view to the administration of the
property, for the benefit of all concerned in *concurso,* and if
so, whether such appointment by the creditors, sanctioned by
the District Court, constituted them legal administrators of
the succession.

That an estate not represented by an heir, might by the According to
the Spanish law, Spanish law, be provided with an administrator or curator, an estate not re- at the instance of creditors, with a view of administering it presented by an
heir, might be *in concurso,* appears to us well established by authority. provided with an
administrator or *Salgado* on this point, says: " *Hœriditati, œre alieno gravatœ* curator, at the *nondum aditœ sed jacenti, instantibus cretitoribus pro solutione,* instance of cre-
ditors, with a *dandum esse curatorem cum quo judicium concursus agi possit* view to adminis-
ter it *in concur-* *legitime inter hœreditatem et creditores, abunde diximus,*" *so,* for the bene-
fit of all concern- *part* 1, *chapter* 32–1. ed.

The same author considers it quite immaterial, whether
the person so appointed, be denominated curator, adminis-
trator or syndic, and he recognises the right of creditors, to
indicate the proper person to be appointed.

This species of *concurso* or *ocurencia de acreedores,* is treated
of by Febrero, in the passage cited by the counsel for the
defendant, as a proceeding which often takes place without
the concurrence of the debtor himself, as when his creditors
on the death of the debtor, present their claims in the
tribunal, charged with his *testamentaria,* or when they unite
in proceeding against the property of the debtor, on his flight
or failure.  Among the points of difference between this and
other kinds of *concurso,* that author gives the following : "*que
en este no hay memoriales de bienes, ni acreedores, ni á instancia*

EASTERN DIST.
*June*, 1835.

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R

*del deudor se convocan, ni citan, ni se fijan edictos, ni tampoco se nombra regularmente defensor y on el otro, si ; bien que cuando se forma por muerte, fuga ó quiebra y se ignora que acreedores tiene, se debe nombrar de oficio, y llamarlos por edicto, y así se practica on esta corte.*"

These authorities appear to us to sanction a proceeding on the part of the creditors *in rem*, against the estate of a debtor not otherwise represented, for the purpose of procuring the payment of their claims in the nature of a *concurso necesario*, and the appointment of a *defensor* by the tribunal in which it is instituted. But, it is contended that even admitting the right to institute such proceedings, yet in this case they are void, first, because no citation or notice was previously given to the heirs ; and, secondly, because the District Court had no jurisdiction, but the Probate Court alone could have taken cognizance of such a case.

It is only necessary to seek out and cite the heirs, in a proceeding to administer an estate *in concurso*, to ascertain if they will accept or renounce the succession : and where the tutrix was present and renounced the community, and declined either accepting or renouncing for the minor heirs, whose rights were fully exercised by her, it was held, that no other citation or notice to them was necessary.

I. In support of the first ground of nullity, the appellants rely on the authority of *Salgado, part* 1, *chapter* 32, *number* 23, *et seq.* He says, an heir ought to be first sought after *hæres perquerendus erit ;* and he adds, that if it is certain one has been instituted by testament, he must be specially cited by name. The widow, who was present in the place, and who alone could have exercised the actions of her minor children, and by an acceptance put an end to the administration by syndics or curators, was well informed of these proceedings. She joined in executing certain powers of attorney with the syndics, relating to the interests of the estate. The only purpose for which it was required to seek out an heir, was to ascertain whether such an heir would accept or renounce the succession. The widow had taken time to deliberate, had procured an inventory to be made, and finally renounced for herself before these proceedings begun on the part of the creditors.

The rights of minors, situated as these were, are fully exercised by their tutors. *Civil Code* 172, *article* 120. It cannot be pretended that the children personally were entitled to notice ; and in our opinion, the only legitimate consequence which would follow from a neglect to call on

EASTERN DIST.
*June*, 1835.

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R.

the tutrix in a more formal manner, to accept or renounce, when she herself acquiesced, with a full knowledge of the proceedings, and neglected to interfere, would be to authorise a restitution *in integrum* on the part of the minors, so far as they could show themselves injured by the proceedings.

II. The second ground of nullity urged, to wit : the want of power in the District Court to make such an appointment, and to entertain jurisdiction in relation to the administration of such a succession, has been pressed upon us with great force of argument, and the question is not free from difficulties. It is said that, even admitting the jurisdiction of the District Court, *ratione materiæ* of a suit for debt against an estate or its legal representative, yet the power to appoint such representative, under the denomination of administrator or curator, always pertained exclusively to the Court of Probates.

Although the estate of Poultney is considered as having been vacant, because its possession was not claimed by an heir or under any other title according to the definition given by the Code of 1808, yet it does not appear very clear that it was of that class of vacant estates, to which the Court of Probates had the exclusive authority to appoint a curator. Article 120, page 172, declares, that "such administration shall not take place if all the heirs are present or represented in the territory, though all or some of the heirs should be minors ; the rights of such minors being fully exercised by their tutors or curators." The creditors, at the same time, have rights to exercise ; in this particular case, a mortgage with the privilege of vendor, *jus in re*. They had a right to pursue the property wherever it might be found, into whose soever hands it might come. This was a case not expressly provided for by the Code, and the creditors applied to the District Court for redress, a court of general jurisdiction and with ample powers to afford relief. Under its authority, syndics were appointed as defensors, against whom the creditors proceeded to exercise their hypothecary actions. The authority to make such appointments as are incident to its jurisdiction of the cause, is recognised by Spanish commen-

Under the *Civil Code* of 1808, the District Court had jurisdiction *ratione materiæ*, of proceedings against a vacant estate, administered for the benefit of creditors, and could legally appoint administrators, curators or syndics to administer and dispose of the property of such estate, for the benefit of all interested therein.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

tators.    That the District Court was not without jurisdiction *ratione materiæ*, of a suit against an estate, and that judgments rendered in such cases are not radically null, is fully settled in the case of Tabor *vs.* Johnson.    The undisputed exercise of such jurisdiction for a long series of years, the general acquiescence of the legal profession, the universal understanding among the people, as well as the courts and the bar, form together such contemporaneous interpretation of the laws relating to conflicting jurisdictions, that however doubtful it may appear on a close analysis, it cannot now be disturbed without the greatest injustice, and inflicting incalculable mischiefs on the country.

We come now, to inquire into the proceedings had by Harrod & Ogden, against the syndics, in pursuance of which, the land in controversy in this case, was sold to satisfy a mortgage, with the privilege of vendor, and which was due to them under a subrogation from Madame Rousseau. · If that alienation was valid, it is not necessary to inquire into the proceedings subsequently prosecuted in the Probate Court; because this being a petitory action, the plaintiffs cannot recover without showing title in themselves, and if the estate had been previously divested of title, the heirs are precluded by such alienation.    It seems to be supposed, that the court has established a contrary doctrine in the case of Bedford *vs.* Urquhart et al., recently decided, but on examination of the opinion of the court in that case, it will be found, that such a question did not arise, but that on the contrary, the court adhered to the principle laid down in the case of White *vs.* Holstein : " that the persons claiming the estate, are bound to make good their title against the legal possessor, and in opposition, the latter has a right to set up and prove by legal means, any title which may defeat the claim of the plaintiffs."    In the case now before us, the defendant exhibits title under a conveyance from C. Harrod and F. B. Ogden, and in support of his right to be maintained in possession, is authorised to show, that the estate of Poultney was divested of title by the proceedings in the District Court.    To this it is objected, that the repre-

In a petitory
action, persons
(as heirs) claim-
ing the estate,
are bound to
make good their
title against the
legal possessor;
and in opposi-
tion, the latter
has a right to set
up and prove by
every legal
means, any title
which may de-
feat the claim of
the plaintiffs.

sentatives of G. M. Ogden, the first purchaser, repudiated that title, and proceeded to divest the heirs by a new suit, thereby admitting the title of the heirs existing, at the time proceedings were commenced in the Probate Court.  But we are of opinion, that those proceedings were instituted to strengthen the original title, acquired under the first alienation, and that the declaration of the representatives of Harrod & Ogden, that those proceedings were null, cannot avail the plaintiffs, who were not parties, and that the principal object was to cancel certain mortgages retained by the sheriff, and that the sheriff was not a competent party for any other purpose.  The allegation in that petition, that the first purchase by G. M. Ogden, was a nullity, is not such a judicial avowal as will avail the present plaintiffs; and if they rely on it as an avowal, they must take it all together; as well that part which asserts a title subsequently derived under the judgment against the widow and heirs in the Probate Court, as that which suggests the nullity of the first sale.  10 *Toullier*, 393, *et seq.*

The evidence offered by the defendants, to show that the estate was divested of title, consists of the sheriff's deed to G. M. Ogden, the order of seizure and sale, in virtue of which the sale was made, the sheriff's return, and a copy of the judgment ordering the seizure, and all the proceedings had contradictorily with the syndics.  The sale took place on the 13th of June, 1820, and the writ or order of seizure is dated May 9th.  The sheriff's return shows, that he made demand of one of the syndics, and that more than thirty days elapsed before the sale.  This court has constantly recognised the principle, that the sheriff's deed and return upon the execution and judgment, furnish *primâ facie* evidence of a valid alienation, and that he who attacks such alienation, must show that the forms of law were not complied with.  6 *Louisiana Reports*, 627.  The presumption is, *omnia rité rectéque gesta.*

But it is contended, that Ogden, being one of the mortgagees, was incapable by law, of purchasing the property mortgaged.  The text of the Partida referred to,

EASTERN DIST.
*June*, 1835.

POULTNEY'S
HEIRS
*vs.*
CECIL'S EX'R.

The first purchaser cannot repudiate the title by which he has sold to his vendee; and the averment in a petition, by him, that the proceedings were null under which the title was first acquired, cannot avail third persons who were not parties to them.

The sheriff's deed and return upon the execution and judgment, furnish *primâ facie* evidence of a valid alienation; and he who attacks it must show that the forms of law were *not* complied with.

Mortgagees are not prohibited from bidding for and purchasing the mortgaged premises when sold under execution.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

confines the prohibition to the pledgee, without the consent of the owner of the thing pledged. But under the laws regulating sales under execution to the highest bidder, mortgagees are not declared incapable of buying, and the universal practice, we believe, has been the other way.

It is further objected, that the sale was not advertised according to law. The order of seizure issued on the 9th May, and the sale was made on the 13th June. There was, therefore, time for the advertisement, required by law. It is true, that pending the seizure, the court by consent of parties, fixed the terms of sale; but it does not appear that the regular advertisement was dispensed with. The parties consented to dispense with an appraisement, and this also is complained of; but they also consented to a sale on credit, and, in our opinion, the agreement was advantageous to the estate, as the whole debt was due. The syndics were authorised to give such a consent, and it is, in our opinion, binding on the plaintiffs, unless they show they were injured by it.

*Syndics may consent to the terms of sale of mortgaged property, that it be sold on a credit, and without appraisement; and such consent is binding on the heirs who afterwards claim the property, unless they show they were injured by it.*

The several points made by the counsel for the appellants, which relate to the alleged irregularity and nullity of the proceedings that preceded the sale, particularly the 6th 7th, 8th and 9th, go to affect the validity of the judgment and order of the District Court, by virtue of which the sale took place. If the sale itself was regular, we are of opinion, that even the reversal of the judgment would not destroy its effect. This court has repeatedly recognised that doctrine, in relation to sales under execution, and maintained the rights of purchasers under sheriff's sales, although the judgment had been reversed for want of jurisdiction in the court, by which it was rendered. 5 *Martin, N. S.* 214.

*Where sales of property under execution, are regular, the rights of purchasers will be maintained, although the judgment is afterwards reversed, for want of jurisdiction in the court by which it was rendered.*

In relation to the 22d point made by the counsel for the appellants, that the rights of the minors cannot be prejudiced by the neglect or omissions of their tutrix, and that any deviation from the forms prescribed by law, for the alienation of their property is fatal, and the sale a nullity, the court has already expressed its opinion, that the rules which apply to the sale of minors' property as such, when the title is fully

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIIS EX'R.

vested in them, are not strictly applicable to a case like the present, where the rights of the minors were contingent and residuary, subject to the undoubted claims of creditors, *deducto ære alieno*, and who, in this very case, appear only as beneficiary heirs, claiming property already alienated for the payment of debts, which, if their tutrix had accepted in 1820, would have been due by them, and the property now sued for, would have been a pledge in their hands, for their payment.    The proposition, therefore, that the rights of minors cannot be prejudiced by the negligence and omissions of their tutors, must be received with great limitations.    So far as minors are prejudiced by the negligence or omissions of their tutors, they are entitled to restitution; but it does not follow, that the acquired rights of third persons, resting on the faith of judicial proceedings, are to be sacrificed, not for the purpose of replacing the plaintiffs in the position they would have occupied, if their tutrix had assumed the administration of an estate, so overwhelmed with debt that she renounced her own eventual interest in it as widow, but to give them possession of the property, when it is manifestly impossible, at the same time, to restore the creditors, whose rights are not less sacred to their original condition in relation to the estate.   Coming forward with such pretensions, it is evident they seek something more than restitution: *certant de lucro captando*.    But a review of the cases cited by their counsel in support of this principle, will show that this court has never pushed the doctrine to that extreme.    In Chesnaux's heirs *vs.* Sadler, the question was, whether the alienation of immoveables belonging to a minor, made by the tutor, without any judicial authorisation, was binding on the pupil, and the decision was against the sale; but even in that case, the court seems to recognise the principle, that if the alienation were *primâ facie* good, the minor would be driven to his action of restitution *in integrum*.    In Gayoso *vs.* Garcia, it was decided that an executor who was authorised to sell, without the intervention of justice, was not dispensed from the obligation imposed by law, of selling at public

54

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
CECIL'S EX'R.

auction, and that a private sale was void, as to the testamentary heirs, who were minors. The case of Elliott vs. Labarre, presents the single question, whether the sale of the property of a succession belonging to absent heirs, by the register of wills, without an order of the judge of probates, was binding on the heirs, and it was decided in the negative. In Donaldson vs. Dorsey's syndics, nothing more was decided than that a sale made under a judgment, to which neither the plaintiffs nor their mother were parties, did not divest them of the title. The principle settled in the case of Fletcher vs. Cavelier, is too self-evident to require comment, to wit: that the sale of minors' property by private contract, is void.

We have thus far considered the principles of law and equity involved in this case, without regard to the verdict of the jury to whom it was submitted in the court below, and whose finding was in favor of the defendants. It only remains to notice the bill of exceptions taken by the defendants to the charge of the judge.

After a deliberate examination of that charge, we find that on the leading principles of the case, it does not vary materially from the views which we have expressed. In some particulars, perhaps, the judge may not have laid down the law with sufficient limitations, and in the hurry and confusion of a jury trial, a great degree of precision is not to be expected, particularly in a case so novel in its character, and so complex in its details. In the main, the cause was fairly laid before the jury, and the facts left entirely to them, with instructions on the points of law of which the plaintiffs have no just cause to complain. Although the opinion of this court might differ essentially from that of the court below, on some of the various questions of law involved; yet, as the verdict has, in our opinion, done justice between the parties, we do not feel authorised to disturb it.

In conclusion, we cannot forbear to add, that it appears to us, the proceedings which led to the alienation of the property in controversy, growing out of the extreme disorder of

Poultney's affairs, were carried on in good faith, conducted on all sides by the most distinguished and experienced jurists of that day, before a court whose jurisdiction was not then questioned, acquiesced in by the tutrix of the plaintiffs, who had a right to exercise all their actions, and who considered it most prudent not to hazard her own, in the wreck of her husband's fortune. The property was sold to reimburse his endorsers the sums paid by them for the purchase of the property itself. The success of the plaintiffs in this case, would involve the same parties or their heirs in aggravated ruin, as warrantors of the property to the present possessors. If we consider the situation of things at that time, we are far from being satisfied that the condition of the minors would have been bettered by accepting the succession of their father. Fifteen years have, indeed, produced great changes; a plantation has risen into a city; but time, while it enhances the value of property, does not affect the immutable principles of justice.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be affirmed, with costs.